# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### CLARKSBURG

| | |
|---|---|
| **SUZANNE DAWN DAVIS,** | |
| Plaintiff**,** | **CIVIL ACTION NO.: 1:16-CV-61** |
| **v.** | **(JUDGE KEELEY)** |
| **NANCY A. BERRYHILL,**<br>**Acting Commissioner of Social Security,** | |
| Defendant. | |

## AMENDED[1] REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On April 11, 2016, Granville J. Davis on behalf of Suzanne Dawn Davis, deceased ("Suzanne"), by counsel Brian D. Bailey, Esq., filed a Complaint in this Court to obtain judicial review of that final decision of Defendant Nancy A. Berryhill,[2] Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).   On June 13, 2016, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 6; Admin. R., ECF No. 7). On July 11, 2016, and August 22, 2016, Suzanne and the Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 14)  Following review of the motions by the

---

[1] This Amended Report and Recommendation primarily corrects a formatting issue on page 30, in which a portion of the recited facts inadvertently displayed as a symbol. Accordingly, there are no substantive changes from the original report and recommendation entered July 31, 2017.

[2] After this suit was filed, but before this Report and Recommendation was entered, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of Social Security. Accordingly, pursuant to Rule 25(d), Fed. R. Civ. P., and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for Carolyn W. Colvin.

parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  PROCEDURAL HISTORY

On December 9, 2010, Suzanne protectively filed her first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on September 15, 2008. (R. 176).  Suzanne's earnings record shows that she acquired sufficient quarters of coverage to remain insured through September 30, 2013 (R. 186); therefore, Suzanne must establish disability on or before this date.  This claim was initially denied on April 25, 2011 (R. 94) and denied again upon reconsideration on August 26, 2011 (R. 114).  On October 24, 2011, Suzanne filed a written request for a hearing (R. 128), which was held before United States Administrative Law Judge ("ALJ") Kim S. Nagle, presiding over the hearing in Cumberland, Maryland, by video from Chicago, Illinois, on August 20, 2012. (R. 44). Suzanne, represented by counsel Anthony Rogers, Esq., appeared and testified, as did Susan Etenberg, an impartial vocational expert, by telephone. Id. On January 18, 2013, ALJ issued an unfavorable decision to Suzanne, finding that she was not disabled within the meaning of the Social Security Act. (R. 20-43). On May 5, 2014, the Appeals Council denied Suzanne's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

On January 7, 2015, the District Judge issued a Memorandum Opinion and Order (Case No. 5:14-CV-83, ECF No. 15) remanding the case to the Commissioner for further action in accordance with the Report and Recommendation of the Magistrate Judge (Id., ECF No. 14) as to Suzanne's claim. However, the Suzanne had passed away five days prior on January 2, 2015. (R. 1166). Following the vacation of the Commissioner's decision and Appeals Council Order remanding the case (R. 879), a rehearing was subsequently held before Administrative Law

Judge ("ALJ") Brian Rippel on November 17, 2015. (ECF 741). Following the hearing, the ALJ issued an unfavorable decision denying benefits. (R. 714). The Suzanne filed no written exceptions to ALJ Rippel's decision within 30 days, and the Appeals Council did not review ALJ Rippel's decision within 60 days. (ECF No. 1 at 2). Accordingly, ALJ Rippel's decision became the final decision of the Commissioner on February 14, 2016 pursuant to 20 C.F.R. §§ 404.983[3] and 984.[4] (R. 713).

## III.   BACKGROUND

### A.   Personal History

Suzanne[5] was born on March 4, 1978, and was 32 years old at the time she filed her claim. (R. 176). She completed one (1) year of college and two (2) years of vocational training in cosmetology (R. 213). Suzanne's prior work experience included cashier in a retail department store (1997-1998), plastics factory laborer (1999-2005), hair cutter (2007-2008), short order cook (2006), and waitress (2010). (R. 213). She was single at the time she filed her claim (R. 176) and was single at the time of the administrative hearing. (R. 44). At the time of the hearing, Suzanne had one child, who she lost custody of previously and retained only visitation rights (R. 56). (Suzanne subsequently had a second child in January 2013, while this case was still pending. (R. 727)). Suzanne alleged disability based on bipolar disorder, chronic hepatitis C (R. 212), anxiety/social anxiety, panic attacks, and post-traumatic stress syndrome. (R. 67). Suzanne noted

---

[3] 20 C.F.R. § 404.983 provides in relevant part that "[w]hen a Federal court remands a case to the Commissioner for further consideration, the Appeals Council, acting on behalf of the Commissioner, may make a decision, or it may remand the case to an administrative law judge with instructions to take action and issue a decision or return the case to the Appeals Council with a recommended decision.

[4] 20 C.F.R. § 404.984(a) provides in relevant part that "In accordance with § 404.983, when a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case."

[5] Although normally "Plaintiff," here, after Suzanne passed away, her father, Granville Davis, was substituted as the Plaintiff in this case. Additionally, her mother, Ms. Judy Davis, testified at the second ALJ hearing and is discussed in this report and recommendation. Accordingly, for the sake of clarity and to avoid any confusion that might arise by the use of "Plaintiff" or "Ms. Davis," the undersigned refers to Suzanne Davis by her first name.

at her hearing before the ALJ that "there's probably other things but [she couldn't] really think of the whole big list." Id.

**B.    Relevant[6] Medical History**

**1.    Medical History Pre-Dating Alleged Onset Date of September 15, 2008**

Suzanne's treating physician was Dr. William Thomas, M.D. On April 2, 2007, she saw Dr. Thomas, M.D., at New Creek Family Medicine for a psychiatric evaluation. (R. 298). She reported panic attacks daily, and problems with concentration, focus, sleep, energy, irritability, and depression. Id. She denied any current suicidal ideation. Id. Her problems started when she was fourteen, but had since "escalated." Id. She used to "love being around people," but had been "mostly [] shutting [her]self in." Id. She described periods of mania, or "real high moments," "where she will clean the whole house instead of sleeping," as well as racing thoughts and spending sprees. Id. Her biggest problem, however, was "low motivation [and] panic."

Suzanne had a history of substance abuse including painkillers, which she quit some months ago. (R. 298). She reported that she used cannabis to help her sleep. Id. She had a history of psychiatric treatment including "multiple therapists." Id. She had also been hospitalized at nineteen after a suicide attempt by ingesting pills. Id. Dr. Thomas started Suzanne on Seroquel, initially at 25 milligrams, gradually increasing to 50 milligrams and then 100 miligrams. Id.

On September 12, 2007, Suzanne reported doing better with "ups and downs" on a higher dose of Seroquel, but anything above 100-150 milligrams made her feel "shaky." (R. 297). She noted that it did not help much with sleep, however, and also had not had Seroquel in a few

---

[6] The bulk of Suzanne's medical record pertains to her emotional and/or psychological impairments. A small percentage of records pertain to unrelated physical issues – such as her kidneys, gallbladder, back pain, acid reflux, ankle injury, boils, coughs, etc. As these non-psychological, physical issues are neither disputed nor at issue pertaining to Suzanne's claims in this case, those are not addressed in the review of Suzanne's relevant medical history.

months. Id. Her sleep patterns were mixed. Id. She reported occasional cannabis use still, Id., which Dr. Thomas recommended she stop. (R. 297). He restarted her on Seroquel and set a follow-up for one month. Id.

On October 17, 2007, Suzanne was "still not sleeping." (R. 296). She reported that increased dose of Seroquel "made her legs feel funny." Id. She was feeling better, though, and her moods had been "okay." Id. She reported stress from medical problems. Id. Dr. Thomas prescribed Ambien to help her sleep. Id.

On January 15, 2008, Suzanne reported that Ambien "made her [d]o weird things in her sleep," and developed restless leg syndrome ("RLS"). (R. 294). She was "scared" by how "very irritable" she had been after "almost hurt[ing] her son" recently. Id. She reported being unsure what her insurance situation was at present, but "will pay whatever for [her] med[ications]," as she was concerned. Id.

On February 13, 2008, Suzanne reported that she had been doing well for two weeks, but she had regressed into cutting behaviors again after an upsetting call from her ex. (R. 293). Dr. Thomas observed cuts on her left arm at her appointment on February 13, 2008, still visible from "the end of January" when this had happened. Id. She limited conversations with her ex as a result. Id. Her sleep was "pretty good," but was sleeping "maybe a little too much." Id. She reported that her sister was helping her with her son, and her irritability with her son had "gotten better." Id.

On March 14, 2008, Suzanne reported to Dr. Thomas that her problems with her ex have stopped; that he was "a pain in the ass but leaving [her] alone." (R. 292). She reported that she was sleeping pretty well. Id. She had "had some moments, but no more cutting and no severe swings" at that point. Id. Accordingly, she stated that "things are going pretty well so far." Id.

On May 13, 2008, Dr. Thomas noted that Suzanne's medications "seem to be doing alright, but she is more irritable and nervous at times." (R. 291). Her sleep was "alright – better than it was." Id. Dr. Thomas added an additional dose of Depakote in the morning and directed Suzanne to follow up in two weeks. Id.

**2. Medical History Post-Dating Alleged Onset Date of September 15, 2008**

On October 2, 2008, Suzanne reported to Dr. Thomas that she had been taking her Seroquel, but had not had Depakote in two weeks because she had been unable to afford both. (R. 290). She had been irritable and was not sleeping well. Id. On November 4, 2008, Suzanne reported that she had not had her medication for two weeks because they were in a truck that was broken into. (R. 308). Her sleep was "up and down," and her moods had been "poor." Id.

On February 4, 2009, Suzanne reported to Dr. Thomas that she was "doing worse." (R. 370). She did not want to go out in public. Id. Racing thoughts made it difficult to remember things. Id. She could not hold a job; she was fired from her last job for "cussing a customer." Id. She is "up and down all night sleep walking." Id. At times, she has "too much energy." Id. She was still taking Depakote and Klonopin, as well as Seroquel, but more than 25 milligrams "made her legs feel funny." Id. Dr. Thomas discontinued Seroquel as it "[wa]sn't doing much" and switched her to Risperdal. (R. 371). At her next visit on March 4, 2009, Suzanne reported Risperdal had helped her sleep, but that her moodiness and irritability had increased. (R. 372). Dr. Thomas decided to increase her morning dose of Depakote. (R. 372). Suzanne appeared to remain stable at her next visit on April 3, 2009, stating she was doing "pretty well" and her sleep has been "great," but she was still having problems with memory. (R. 274).

On June 4, 2009, however, her moods were down again, had "not been very good," and she had been having a "good bit" of mood swings for about a month. (R. 310). She reported that anger issues were "getting to her the most." She was not sleeping well. Id. She reported having

been clean from heroin for about two months, and had finished treatment at a methadone clinic. Id. At that point, she was taking Klonopin, Risperdal, and Depakote. Id. Dr. Thomas increased her Risperdal dosage and continued the other medications. Id.

On July 16, 2009, Suzanne reported that her meds came up missing and she has been without them for six weeks. (R. 378). She had been "a mess" since then, would not leave the house, and had been "very depressed and anxious." Id. Dr. Thomas noted that Suzanne could not get therapy because her medical card would not pay for it. (R. 379).

At her next visit on March 26, 2010, she had been without her medications for a few months. (R. 382). Her moods were not very good, and her sleep was off and on again. Id. She reported that her ex was "giving her a hard time," and she has been "extra anxious." Id. Dr. Thomas increased her dosage of Klonopin and refilled all of her other medications. (R. 383). Upon return for follow-up on June 3, 2010, Suzanne was "a mess." (R. 384). She reported having "more panic in the past [two weeks] than in the past few months," and she was getting "more and more depressed." Id. She had been in a car accident recently and had not been sleeping well. Id. Dr. Thomas put Suzanne back on Buspar in addition to her other medications. On July 6, 2010, Suzanne reported that Buspar was helping; she did not "feel as sluggish" and was "doing better." (R. 386). However, her sleep was still poor; she had not slept in three days, accompanied by racing thoughts, and worse with stress. Id. Dr. Thomas put Suzanne on Ambien pursuant to sleep problems. (R. 387).

On July 21, 2010, Suzanne was evaluated at Mountain State Psychological Services. (R. 313). She reported problems stemming from a "lifelong history of anxiety and depression." Id. She had seen numerous psychiatric providers at various points over the years, including April House and Brian Henchey at Mountain State Psychological, Dr. Thomas, Dr. Miller, Gregory Trainor, Id., and a doctor in Pennsylvania when she had been suicidal as a teenager. (R. 318).

She reported that she had been able to make progress in the past. Id. She reported that her relationship with her parents had been strained at times, but was "good" at that point. (R. 314-15). She did not have many friends, and listed only one person she considered a close friend. (R. 315).

On December 29, 2010, Suzanne returned to Dr. Thomas after a few month's absence, stating she had had gallbladder surgery, had been depressed, had not left her house, and had not been talking to people. (R. 422). She was seeing Dr. Miller in Oakland and he had prescribed Celexa, but it did not help. Id. Dr. Thomas had her stop Celexa, and put her back on her other medications, which she had been off for three months, and added Ventafaxine. (R. 423).

On January 11, 2011, Suzanne reported that she had started to feel "a bit better," but then it stopped working. (R. 424). She was "isolating more," and had "no desire to go out in public." Id. Ambien was only keeping her asleep for about four (4) hours. Id. Risperdal was "making her feel weird," so Dr. Thomas discontinued that and used Depakote as a mood stabilizer, and increased Effexor to 150 mg. (R. 425). At her next visit on March 2, 2011, she reportd that the Effexor increase "helped a bit," and she was feeling better after stopping Risperdal. (R. 426). Her mood was "okay," though she was "scared to drive after accident." Id. She reported that her sleep was really good without Ambien. Id.

At follow-up for evaluation on May 26, 2011, Dr. Thomas noted that Suzanne was currently also seeing April [House, M.S.] at Mountain State Psychological Services and was taking her meds, which included Cymbalta, Depakote, Klonipin, Buspar, and Ambien. (R. 576). Despite seeing multiple providers and being on her medications at that point, she "[was] a mess," "very depressed[, did]n't want to do anything," was "irritable" and "getting worse about leaving the house." Id. She had experienced "some manic episodes over the past couple days." (R. 576).

At her next follow-up on August 24, 2011, Suzanne had tried Cymbalta and gained twenty (20) pounds in two weeks, and saw no change in her mood, so she stopped taking it. (R. 578). Dr. Thomas prescribed her Prozac to try instead. (R. 579). She reported not wanting to leave the house, worrying "all the time," and disliking going into stores. (R. 578).

At follow-up on December 9, 2011, Suzanne was "not sure if Prozac [was] helping or causing prob[lems]." (R. 580). She was "agitated and irritated, not sleeping, crying . . . losing it over the smallest things, [s]haky inside and out," and panicked. (R. 580). Dr. Thomas increased her Prozac dose, and switched her from Klonopin to Ativan and from Ambien to Trazodone since her Ambien was not working. (R. 581). He noted that they would need to watch her for mania.

At follow-up on February 28, 2012, Suzanne reported that her sleep had been better on Trazodone, "but mood-wise, nothing is working." (R. 582). She didn't feel that Ativan was helping her "at all," so it was discontinued. Id. She reported having been snappy, a "bitch," nervous, and averse to leaving her house. Id. "She cries if she has to leave, [and] hasn't been to the market in [three (3) months]." Dr. Thomas decided to "add Wellbutrin . . . to her Prozac for mood boost," and "changed Ativan to Xanax." (R. 583). Dr. Thomas also "encouraged her to get out of the house at times." Id.

At follow-up on April 9, 2012, Suzanne had gotten her meds filled from last visit, but did not get to take them because her house was robbed. (R. 584). Accordingly, her mood had not improved and was "about the same." Id. Additionally, CPS had taken her child from her recently, because they "don't think that she can care for her child because of the meds [] she is on." Id. At next follow-up on May 8, 2012, Suzanne added that she went to court over the loss of custody of her son. (R. 586). "They brought up her previous drug use as well as her bipolar [history] and she lost him," without being offered an improvement period. Id. She planned to take programs for

parental training and rehab through the state in order to get her son back, as she was concerned for his well-being in the custody of his biological father. Id. On August 9, 2012, she reported that "her parents have now disowned her" and "won't speak to her." (R. 588). She had not slept in two days; and had cleaned all night. Id. She reported racing thoughts, shaking, panic, and tearfulness. Id. Dr. Thomas decided to discontinue Suzanne on Prozac because he thought it might be "making her hypomanic," and she said it made her feel "bad." (R. 589). Dr. Thomas noted that he was hesitant to prescribe her Lithium because of her kidney problems, and decided to keep her on Depakote for now. Id.

On January 5, 2011, April House, M.S. noted Suzanne's included initial services when she was a teenager pursuant to a suicide attempt; then at age twenty-one (21) pursuant to a psychiatric hospitalization in Pennsylvania for another suicide attempt, as an outpatient at age twenty-two (22) to twenty-three (23), and again as an outpatient in 2007 and 2010. (R. 398). On July 29, 2010, results of a valid Minnesota Multiphasic Personality Inventory (MMPI-2) test revealed Suzanne admitting personal problems that were "chronic in nature," with code type 1-8/8-1(7). Id.

On March 27, 2013, Suzanne reported she had a baby January 30, 2013. (R. 1163). She had to go off her medications during her pregnancy, which made her moods "pretty shitty." (R. 1163). The OB-GYN put her on Wellbutrin, but it "did nothing." Id. Suzanne wanted to go back on Xanax and Depakote, which Dr. Thomas prescribed. Id.

Suzanne was evaluated by Tony Goudy, Ph.D. on April 18, 2013. (R. 701). Dr. Goudy completed a full psychological evaluation including a Clinical Interview and numerous psychological tests (see Medical Reports/Opinions below). Suzanne returned to Dr. Thomas on April 26, 2013. (R. 1161). She reported that she had "taken a PTSD test and scored severe." Id. She reported "doing okay" since restarting her medications. Id. However, having to discuss a "lot

of past traumas" with [Dr. Goudy] caused her to start having "major meltdowns," as well as increased panic, anxiety, and depression. Id. Dr. Thomas started her on Paxil "due to the PTSD symptoms," and increased her Xanax "for increased panic." He noted to "watch for mania, but right now she is very low." Id.

On August 16, 2013, Suzanne returned for follow up, stating she was ""here, that's about all." (R. 1159). She had recently spent fourteen days in jail after she and her son went out with a friend. Id. She reported drugs were found in the car they were in, but CPS was dropping it because the drugs were not on her, the car was not hers, and she did not know they were there. Id. As a result, she had been without her medication for those fourteen days because the jail did not give her any. Id. Dr. Thomas increased her dosage of Paxil. (R. 1160). At follow up on November 5, 2013, Suzanne reported that had "helped some." (R. 1157). She still was not sleeping well, however. Id. Dr. Thomas prescribed 5 milligrams of Ambien, "but warned her to watch for over-sedation with the Xanax." (R. 1158).

On February 5, 2014, Suzanne reported her moods had been "like shit." (R. 1155). Lately, she had been "all down, no mania;" she had "no energy, could care less what happens and wants to crawl into a hole and stay there." (R. 1155). She was sleeping more with Ambien, at least. Id. Dr. Thomas increased her Paxil dose. Id. On March 19, 2014 she reported feeling "about the same," and she could not sleep "for two days" after the increase. (R. 1153). Her moods had been "mostly blah." Id. Dr. Thomas decided to start Suzanne on Latuda and see if that helped. Id.

On June 19, 2014, Suzanne reported that Latuda gave her energy and she "felt great" at the lower dose – increasing the dosage made her feel "weird and as if she wanted to grind her teeth." (R. 1151). Beyond her energy, however, her sleep was "okay" and her panic had gotten worse. Id. She had significant stress from her family interfering and reported being stressed out

lately. Id. She reported that the day before, "her anxiety was so bad that she locked herself in the basement" and was "[short of breath]." Id. Dr. Thomas put her back on Paxil for her anxiety. (R. 1152).

Suzanne returned on September 29, 2014 reporting that she had gone through a manic spell recently, and was "bouncing off the walls," but she "got through it." (R. 1144). She reported that she had been staying with her parents, but there was a robbery and her parents "pinned it on her," resulting in her going to jail. Id. However, she stated that subsequently, the "true robber was found and it was dismissed." Id. She did not go back to her parents'. Id. She stayed "at her camp" for a while, until the [heating] oil was stolen. Id.

On December 29, Suzanne saw Dr. Thomas for the last time. (R. 1142). She reported that she "didn't do well with Christmas," as her "moods are low each year at this time." Id. She reported being irritable and "bitchy and wouldn't even want to talk to herself." Id. She was not sleeping. Id. Her neighbor's "noisy kids" were not helping the situation. Id. She had attempted to go back to work at Burger King. Id.

On January 2, 2015, Suzanne was found deceased. (R. 1166). Results of a toxicology screen showed "metabolites of heroin" (R. 1172) in her system, as well as Alprazolam (Xanax), which she was prescribed by Dr. Thomas. (R. 1167).

### 3. Medical Reports/Opinions

#### a. *Mental Status Examinations Pursuant to Consultative Examinations*

On January 9, 2009, Tracy Cosner-Shepherd, M.S. completed a Clinical Interview ("CI") and Mental Status Examination ("MSE"). (R. 300-306). Ms. Cosner-Shepherd noted Suzanne's extensive mental treatment history spanning age fourteen to present:

> She stated that she has been in and out of counseling since she was 14 years old. When she was 14, she worked with psychologist Greg Trainor in Keyser, West Virginia, for

about six months to a year and said that she was suicidal at the time. When she was 19 years old, she spent two days at a hospital in Johnstown, Pennsylvania, due to a suicide attempt. In 2001 or 2002, she worked with Marlene Klein in Petersburg, West Virginia, for several months. She was then referred to Dr. Eagle in Harrisonburg, Virginia, where she was treated for a period of about six months and first diagnosed with bipolar disorder. Last year, she worked with Laura at Mountain State Psychological in Keyser, West Virginia. She worked with Laura for approximately a year. She has working with psychiatrist, Dr. Thomas in Keyser, West Virginia, for the last one and a half years and said she has been treated for bipolar disorder.

(R. 301-02). Ms. Cosner-Shepherd observed Suzanne's attitude was cooperative, her eye contact was good, and her speech was relevant but "a bit monotone." (R. 303). Her thought process was within normal limits and organized; her thought content was fixated on having things in their proper place. Id. She denied illusions or hallucinations. Id. Her insight was fair to average; her judgment was within normal limits. Id. Although she had a history of suicide attempts, she denied any recent suicidal ideation or homicidal ideation. Id. Her immediate and remote memory were within normal limits; but her recent memory was markedly deficient. Id. Her concentration was found to be "mildly deficient based on her ability to calculate serial 3s." (R. 303-04). Her psychomotor behavior was within normal limits. (R. 304). Her subjective symptoms included:

> [Being u]neasy around others, nervousness/anxiety, panic attacks, difficulty dealing with people, tendency to be irritable or snap at others, fluctuation of mood with depression lasting for about a week, difficulty sleeping, nightmares of rape, tendency to go months without sleep, tendency to still have energy without sleep at times, tendency to self-isolate at times, tendency for things to be a certain way or order, poor appetite, weight loss, crying spells, history of suicide attempts, periods of excessive energy with compulsive cleaning, difficulty finishing what is started, poor concentration and memory, and poor memory.

Id. Ms. Cosner-Shepherd's objective findings were:

> History of some family dysfunction with past abuse and traumatic rape, poor coping skills with a history of polysubstance dependence and abuse, history of mood swings with depression and anxiety including possible PTSD, history of psychiatric treatment, history of minor legal difficulties due to drug-related issues, impaired memory skills, and impaired concentration skills.

Id. Ms. Cosner-Shepherd's diagnoses included anxiety disorder NOS [not otherwise specified],

mood disorder NOS, personality disorder NOS, and polysubstance dependence, in early partial

remission. Id. Ms. Cosner-Shepherd elaborated that:

> [Regarding her] diagnosis of mood disorder NOS . . . She did state that she was
> diagnosed with bipolar disorder when she was younger. She continues to receive
> mental health treatment with a psychiatrist who also diagnosed her with the disorder.
> That diagnosis should be confirmed, although substance use could play a factor in her
> mood disturbance, as well as her difficulty dealing with past trauma. She did report
> problems with anxiety and stated that she does have panic attacks, thus the diagnosis of
> anxiety disorder NOS. **On[e] should rule out the possibility of a panic disorder and/or
> social phobia and/or PTSD, which does appear to be appropriate. Many of her
> symptoms do appear to be consistent with posttraumatic stress disorder, such as
> difficulty sleeping especially due to nightmares, and so forth**. The additional diagnosis
> of personality disorder was based on her history of substance abuse/dependence, legal
> trouble, and mental health treatment.

(R. 305) (emphasis added).

On April 12, 2011, Ms. Cosner-Shepherd completed a second CI and MSE of Plaintiff.

(R. 595-600). At this MSE, Suzanne's attitude was cooperative, her eye contact was good, and

her responses were "adequate, but they were a bit short." (R. 598). Her thought process was

within normal limits and organized; her thought content was fixated on a fear of driving

following an accident, and obsessive-compulsive tendencies with cleaning. Id. She denied

illusions or hallucinations. Id. Her insight was fair; her judgment was within normal limits. Id.

Although she had a history of suicide attempts, she denied any recent suicidal ideation or

homicidal ideation. Id. Her immediate and remote memory were within normal limits; but her

recent memory was moderately deficient. Id. Her concentration was found to be "mildly

deficient based on her ability to calculate *serial sevens*;" Id., on the next page, however, Ms.

Cosner-Shepherd notes that Suzanne's concentration was "mildly deficient based on her ability

to calculate *serial 3's*." (R. 599) (emphasis added). Her psychomotor behavior was within

normal limits. (R. 598). Suzanne's subjective symptoms included being "[u]neasy around others,

some anxiety in stores or public, difficulty sleeping, nightmares, lack of sleep without

medication, poor appetite, weight loss, crying spells, depression, self-medication with drug use, poor energy, fluctuation of energy, depressed mood, easily agitated, problems with memory, [and] problems with concentration." Id. Ms. Cosner-Shepherd's diagnoses pertaining to mental conditions were the same as before, although she again noted with regard to anxiety disorder NOS that posttraumatic stress disorder should be confirmed:

> She stated that she is bipolar; however, **some of her symptoms could be related to** depression, as well as **the possibility of posttraumatic stress disorder, which she likely has dealt with with drug use. She did admit to self-medicating**. She noted difficulty sleeping and said when she does sleep she has nightmares. **Thus,** one should rule out the diagnosis of bipolar versus a depressive disorder, and **one should confirm a diagnosis of posttraumatic stress disorder, which does seem appropriate.**

(R. 599) (emphasis added).

### b. *Disability Determination at the Initial Level*

On February 1, 2011, agency reviewer K. Sarpolis, qualifications unspecified, reviewed Suzanne's records and completed a physical residual functional capacity ("RFC") assessment. (R. 407). Reviewer Sarpolis found Suzanne's physical conditions to be non-severe, elaborating that "her ADLs are normal and do not list any limits due to physical impairments." Id.

On April 23, 2011, agency reviewer Debra Lilly, Ph.D. reviewed Suzanne's records and completed a psychiatric review technique ("PRT") assessment. (R. 408). Dr. Lilly evaluated listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders). Id. Dr. Lilly found three medically determinable impairments that did not precisely satisfy the diagnostic criteria of those listings: "mood disorder given different names," (R. 411), "anxiety disorder given a variety of names from different sources," (R. 413), and "personality disorder." (R. 415). Dr. Lilly found that these impairments caused mild limitations in restriction of activities of daily living, and mild

difficulties in maintaining social functioning, concentration, persistence, or pace. (R. 418). Dr. Lilly noted "one or two" episodes of decompensation, each of extended duration. Id.

### c. *Disability Determination at the Reconsideration Level*

On August 25, 2011, agency reviewer Fulvio Franyutti, M.D. reviewed the prior RFC assessment and affirmed it as written. (R. 603). No further comment or explanation was provided. Id. On August 23, 2011, agency reviewer Bob Marinelli,, Ed.D., reviewed the prior PRT assessment and affirmed it as written. (R. 602). No further comment or explanation was provided. Id.

### d. *Mental Impairment Questionnaire from Treating Source*

On April 9, 2012, Dr. Thomas completed a Mental Impairment Questionnaire (RFC & Listings) for Suzanne, who he had been seeing since 2009. (R. 431). Suzanne's DSM-IV Mental Evaluation listed the following diagnoses: Bipolar disorder and Anxiety NOS (Axis 1), Insomnia (Axis III), Chronic Mental Illness (CMI) (Axis IV), and a current Global Assessment of Function (GAF) score of 50 (Axis V). Id. Suzanne's highest GAF in the past year was also a 50. Id. Dr. Thomas listed the following signs and symptoms: poor memory, appetite disturbance with weight change, social withdrawal or isolation, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, feelings of guilt or worthlessness, difficulty thinking or concentrating, sleep disturbance, personality change, social withdrawal or isolation, blunt, flat or inappropriate affect, decreased energy, manic syndrome (sometimes), generalized persistent anxiety, hostility and irritability. Id.

Mental status evaluation showed that Suzanne was alert and oriented, described her mood as "I'm here," displayed blunted affect, and did not have suicidal or homicidal ideation. (R. 432). Dr. Thomas opined that Suzanne was not a malinger, and her impairments were reasonably consistent with the symptoms and functional limitations described in this evaluation. Id. He

16

noted adjustments in Suzanne's medications with mood improvements at times, though at the time of this Questionnaire, Suzanne was "currently down." Id. Her prognosis was fair. Id. Dr. Thomas noted that her impairment had lasted for at least twelve months. Id. In fact, Suzanne had these impairments "all [her] life." Id. Her psychiatric conditions were not considered to exacerbate any pain or physical symptoms. Id. Suzanne did not have a low IQ or reduced intellectual functioning. (R. 433).

On average, Dr. Thomas anticipated that Suzanne's impairments or treatment would cause her to be absent from work "more than three times a month." (R. 433). Dr. Thomas opined that, considering Suzanne's medical history, chronicity of findings (of lack thereof), and limitations, her mental and emotional capabilities were affected by her impairments as follows:

Suzanne had a poor to nonexistent ability to remember work-like procedures, maintain attention for two hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, work in coordination or with proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, or deal with normal stress. (R. 433).

Suzanne had a fair ability to understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and be aware of normal hazards and take appropriate precautions. (R. 433-444).

Suzanne had a poor to nonexistent ability to understand, remember, and carry out detailed instructions. (R. 434). She had a fair ability to set realistic goals or make plants independently of others, and to deal with the stress of semiskilled and skilled work. Id. She had a fair ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in an unfamiliar place, and use public transportation. (R. 434). Suzanne had a good ability to adhere to basic standards of neatness and cleanliness. Id.

Dr. Thomas opined that Suzanne had marked restriction of activities of daily living; marked difficulties in maintaining social functioning; and marked deficiencies of concentration, persistence or pace. (R. 434). He further noted four or more episodes of deterioration or decompensation. Id. Lastly, Dr. Thomas opined that Suzanne could manage benefits in her own best interest. (R. 435). He also indicated that Suzanne was not currently abusing alcohol or illegal drugs. Id.

e. *Psychological Evaluation*

On April 19 and May 3, 2013, Tony Goudy, Ph.D. conducted a psychological evaluation of Suzanne. He reviewed two previous evaluations from Tracy Cosner-Shepherd in January 2009 and April 2011, Dr. Thomas' treatment records, and treatment records from Mountain State Psychological (MSPS) spanning 2007 – 2012. (R. 703). Dr. Goudy reviewed Suzanne's prior psychological test results conducted at MSPS in July 2010. Id. Dr. Goudy reviewed and discussed the following: the length of time Suzanne's symptoms have persisted, her mental health treatment history including psychiatric hospitalizations, medications, family history, vocational history, substance abuse history, and legal history. (R. 704).

Suzanne reported bipolar disorder and frequent panic attacks, as well as a history of sexual abuse and symptoms of PTSD. Id. She had "suffered from panic attacks since she was a child, depression since her early teen years, and symptoms of PTSD that have been 'very bad'

18

over the last 10 years." (R. 704). As to her bipolar disorder, Suzanne reported manic episodes with "feelings of intense grandiosity," being awake for up to four days at a time, racing thoughts, being easily distracted, and trying to do numerous things at once without finishing any of them. (R. 702). During her manic episodes, she was also impulsive ("once spend[ing] an entire paycheck on things she did not need the [same day she got it]") and prone to engage in risky behaviors (drug and alcohol abuse). Id. When her mood swung back down in depressive phases, she had little energy or interest in anything, even things she used to enjoy; she slept poorly, had intense feelings of guilt and worthlessness, and had difficulty remembering and concentrating. Id.

Suzanne first attempted suicide at age fourteen by overdose. (R. 702). Her next attempt was at age nineteen, also by overdose. Id. She additionally reported "slashing her wrist" at age 31. Id. When depressed, she had "great difficulty controlling her emotions" and "typically experienced "at least two extended crying episodes per week." Id. She reported that she used to have panic attacks daily, but at present, her medication limits them to twice a week typically. Id. During panic attacks, she becomes "extremely frightened," and feels as though she cannot breathe. Id. She also experienced "tightness and heaviness in her chest, becomes very shaky, and has sweaty palms." Id.

> During the clinical interview today Ms. Davis admitted that she has a history of physical and sexual abuse. When asked why that history does not appear to be developed in her mental health records, she adamantly stated that the thoughts of the abuse are so painful she tries to avoid speaking of it as much as she can. Initially, she refused to provide details today. However, after being informed that it could be crucial to understanding her mental status she reluctantly relented. Ms. Davis indicated that at the age of four a neighbor molested her. However, she became too emotional to provide specific details regarding the molestation. Additionally, she related that at the age of 19 she was beaten by an individual and raped. She continues to have nightmares about the trauma on a nightly basis, and stated, "It's so horrible that I can't sleep because of it." Ms. Davis reported that she avoids stimuli associated with the trauma. One trauma occurred in the woods, and consequently she stated, "I can't stand the sound of cracking sticks or twigs or the smell of pine. Sometimes it's hard around Christmas because of all the pine around."

One episode of abuse occurred in a quiet room, and because of memories of that room she stated, "I can't have silence or it drives me crazy. I can't stand it if I'm in a room and I can hear the clock ticking." Ms. Davis also reported symptoms consistent with increased physiological arousal, as she is often jittery throughout the day and suffers from a very exaggerated startle response. Regarding the latter, Ms. Davis stated, "I've peed myself many times because of it."

(R. 702-703). In the Mental Status Examination portion, Dr. Goudy observed that while Suzanne was discussing her past abuse, "large red splotches appeared . . . on her neck and face." Further, her psychomotor activity was "significant" – she "wrung her hands and was quite fidgety" throughout. (R. 705).

Dr. Goudy completed a Clinical Interview (CI), Mental Status Examination (MSE), the Beck Depression Inventory-II (BDI-II), the Beck Anxiety Inventory (BAI), Posttraumatic Stress Diagnostic Scale (PDS), and Minnesota Multiphasic Personality Inventory-2 (MMPI-2). (R. 701). His diagnostic impressions included 1) chronic PTSD; 2) Bipolar I Disorder, severe, without psychotic features; 3) Panic Disorder (without agoraphobia), 4) Polysubstance Dependence in sustained full remission, and 5) a Global Assessment of Functioning (GAF) score of 50. (R. 708). He found mild to moderate impairment in her activities of daily living, and marked impairment in social functioning, concentration, persistence, and pace. (R. 709). Dr. Goudy noted four episodes of decompensation – three suicide attempts, and one psychiatric hospitalization. (R. 710). Dr. Goudy opined that "it would appear that Ms. Davis meets a listing based on a combination of psychological factors:"

Ms. Davis should be primarily assessed under 12.0 6 A. 5. Recurrent and intrusive recollections of a traumatic experience, which are source of marked distress.
Ms. Davis should also be assessed under 12.04 Affective Disorders. Specifically under A.3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes.
Additionally Ms. Davis should be assessed under 12.06 Anxiety-Related Disorders. Specifically, under A.3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week.

20

(R. 709). On June 27, 2013, Dr. Thomas reviewed Dr. Goudy's report and wrote a letter stating that he "ha[d] reviewed and agree[d] wholeheartedly with" Dr. Goudy's evaluation and opinions of Suzanne. (R. 711). Dr. Thomas noted that Dr. Goudy's "diagnoses correspond with my thoughts," and he "agree[d] with the [] PTSD [diagnosis]" also. Id.

### f.   *Mental Status Evaluations*

Over the course of Suzanne's treatment in this record, she had – by the undersigned's count – at least forty-three mental status examinations (MSE). In addition to the abovementioned MSE conducted by Dr. Goudy, Dr. Thomas would assess an MSE at each visit; she also was assessed at evaluation by Tracy Cosner-Shepherd and Mountain State Psychological on a few occasions. Id. Due to the volume, and for clarity in conveyance, the undersigned will not recount them all by narrative here. Rather, the most relevant scores or findings from Suzanne's MSEs have been compiled in a table, attached as Appendix A.

## C.   Testimonial Evidence

At the ALJ hearing held on August 20, 2012, Suzanne testified that she was born on March 4, 1978, and was 34 years old at the time of the hearing. (R. 53). Her marital status was single. (R. 54). Suzanne testified that she was evicted from the land on which her parent's trailer was situated in May, earlier that year. (R. 55). She later elaborated that her parents "didn't understand what was going on at the moment [with her energy levels] and we got into an argument and they threw me out." (R. 81).

Since that time, she had been sleeping temporarily at various residences – for short times at her parents' home, and at the home of a number of friends – "wherever there's a bed or someone will take [her] in." (R. 54). Suzanne's son, who was six years old at the time of the hearing, had lived with her until March of that year, when he went to live with his father. (R. 56). Suzanne testified that she was "mentally not able to take care of him at [that] moment," and

Child Protective Services had removed him from her custody. Id. She was granted weekly visitations with him by the court, but actually saw him "once every two weeks." (R. 57). She was seeing a counselor at that time "to work on getting better . . . to be able to at least raise him." (R. 82). Suzanne testified that she had no sources of income at present. (R. 58). She was receiving food stamps, but those were scheduled to stop after September because Suzanne missed her phone review due to not having money for a phone. Id.

Suzanne was not currently working. (R. 58-59). As to her work experience, in the past fifteen years she'd worked as a hairstylist, cashier, instructor, short order cook, and waitress. (R. 61). In 2006, Suzanne worked as a short order cook at the Hamburger Haven. (R. 61). Suzanne then worked as a hair cutting instructor at a beauty school in 2008. Id. She quit after two months, after getting "overwhelmed with the students" and not being able to "get along with them at all." Id. In 2009, Suzanne tried to go back to work as a waitress at the Chat and Chew. (R. 60). She also worked as a "factory laborer" as well. (R. 61). She last worked at a convenience store – Ray's Texaco – in April 2010, where she got coffee for some customers, cleaned shelves, and sometimes covered the register. (R. 60). She worked there for one month before she was fired "due to [her] not being able to get along with customers and workers." (R. 59). After that, Suzanne continued to apply for "any" work – "from fast food restaurants to salons to even cashiering at gas stations." (R. 62). She has not gotten any interviews. Id.

Suzanne also testified regarding her daily activities. She is "in pain most days," and "lay[s] on the couch for the most part of the day or in bed." (R. 62). Suzanne testified that she does "what [she] can do" to help the people she stays with. (R. 64). She babysits her friend's granddaughters for about an hour each day, or every other day. (R. 63). She also tries to "straighten up here and there, but that's really about all [she] can do." (R. 64). "I have no interest in anything. I don't go anywhere so it's more or less sleeping." Id. Sometimes she prepares her

own food; sometimes her friend "might put a soup in the microwave for [her]." <u>Id.</u> She "sometimes watch[es] television." <u>Id.</u> She goes to the store "maybe once every two weeks or three." <u>Id.</u> Suzanne testified that she was able to handle personal hygiene "for the most part," though she was "not as up to what [she] used to be." <u>Id.</u> She is able to do her own laundry. <u>Id.</u> She does not spend time on the internet. (R. 64-65). She spends a lot of time in her room, and does not socialize much with the people where she is staying because "they stress [her] out. They argue constantly." (R. 65).

She no longer had any hobbies or other activities. <u>Id.</u> She no longer had a driver's license. <u>Id.</u> She "believes it was from unpaid fines that [she] lost it," though she could not recall how long ago that was. (R. 65-66). She had been in a "very bad car accident" at one point and has not had her license then or since, she thought. (R. 65). Counsel clarified advised the ALJ that the date of that accident was April 7, 2010. (R. 67). When asked how she gets around, Suzanne testified that she sometimes gets rides from friends and family when she can, but "they're very unreliable." (R. 67). She does not believe she has ever taken public transportation. (R. 66).

The ALJ asked Suzanne what health conditions or impairments prevent her from working. Suzanne responded "social anxiety, I don't get along with people, I have rages, I get angry, panic attacks, and bipolar . . . I can't really think of the whole big list. Post-traumatic stress syndrome also[. I]t tends to hit me sometimes when the most stressed." (R. 67). She was currently taking Trazodone, Ambien, Xanax, Depakote, Wellbutrin, Prozac, and Bactrim. She anticipated starting Lithium soon as well. (R. 70). Suzanne testified that Trazodone makes her tired, and does not always help her sleep problems unless she also takes and Ambien. (R. 71). She has had side effects from Ambien, including sleep walking. (R. 72). Suzanne had been taking Klonopin until it lost effectiveness about four months ago, and her doctor switched her to Xanax. <u>Id.</u> She takes Depakote, but it makes her lethargic and her "concentration's not there."

(R. 74). She takes Wellbutrin and Prozac, but could not say if either helped or had side effects; stating "I have no idea, I'm so messed up right now." (R. 74).

Suzanne testified that she still smokes "maybe half a pack a day," and had to cut down because she does not have much money. (R. 68). She rarely drinks. Id. Suzanne testified that she has struggled with drug problems, but – apart from one relapse in May – had been clean since November. Prior to that, she had used primarily heroin, morphine, and pain pills, with occasional marijuana use, the last instance being about two to three months ago. (R. 75).

Suzanne's counsel next elicited further testimony regarding her earlier statements on hygiene and daily activities:

> Q: You [said] your hygiene [] was not up to what it used to be. Can you explain. . . ?
> A: I used to be one of those people who got up every day and first thing in the morning was you know, the shower, the face wash, the makeup, the hair, the whole nine yards. Not anymore, I'm lucky I take a shower.
> Q: Okay. . . [I]f I had a camera in your home what would I see? Give me a good day, give me a bad day. . . "
> A: A bad day would be roll over, smoke a cigarette and roll back over. Just I can't move, I'll cry, I'll lay in a ball and cry.
> Q: What's wrong at that time? Is it physical pain? Is it mental pain? What's going on at that time?
> A: It's both, it's both. Between what's going on with my back right now and just the normal aches and pains of depression and the feeling of depression.

(R. 75-76). Suzanne further elaborated that she avoids the people she lives with, as well as their visitors, because she does not feel they "are very good people:" "I don't know, there's just something weird about them . . . I guess maybe it' the anxiety or the paranoia. . . I prefer not to be around any of the people that come there." (R. 77). She elaborated that the reason she does not go to the movies, or to the mall, or any places like that, is because "there's too many people in there. They freak me out just being, I feel like I'm, I don't like it when people touch me. I don't like it when they're near me or close to me in line . . . so I won't even go, I avoid it." (R.

77-78). When asked about concentration, she stated that she has none – her "mind skips too much to concentrate on anything." (R. 78).

Suzanne testified that on a "good" day, she would "probably wake up, smoke, lay there for a little bit, maybe fill the dishwasher or get something to eat and go back to the couch." (R. 78). Suzanne testified that before her conditions limited her activities, she had a number of hobbies – "I used to exercise, I used to paint like on ceramics, I used to cross stitch, I used to sew, I used to be into anything I could do with my hands." (R. 78-79).

At the subsequent rehearing pursuant to remand on November 17, 2015, the ALJ noted that the Suzanne had passed away and her father Granville Davis had subsequently been substituted as a party. (R. 743). Suzanne's counsel elicited testimony from Suzanne's mother, Judy Davis, as to her daughter Suzanne's history of emotional difficulties. Id. Suzanne's counsel also submitted an affidavit from April Graham and the most recent statement from Dr. Thomas. (R. 745).

Judy testified that Suzanne had lived with them "pretty much all of her life." (R. 748). During Suzanne's childhood, she began to evidence emotional difficulties as early as grade school. (R. 749). Judy related one early episode in which Suzanne's teacher had moved her to the front of the class in an attempt to help Suzanne, who was struggling with math. Suzanne came home from school "hysteric[al]" and insisting she would not ever go back to school, that the teacher had "deliberately embarrassed her and called her stupid, and she could not handle anything like that." (R. 749). At a subsequent meeting with the teacher, Judy learned that the teacher had not called Suzanne stupid, and the teacher apologized, saying she was only trying to help and she "didn't know why Suzy had [overreacted]" like that. (R. 750).

On another occasion, when Suzanne was about thirteen years old, Judy and Granville returned home from the movie theater to find Suzy had been cutting her arms:

> A. We had left home to go to the movies, Granville and I, and when we came back there was this car in my driveway, and when I went in the house it was Suzy's best friend and her mother. I'm like how did you all come to visit? And she was like, no, Suzy called us. Suzy had started cutting on her arms and couldn't get the bleeding stopped, and she called them for help because at that time we didn't have cell phones.
>
> Q. Did you ever ask her why she did that?
>
> A. I did. I let things settle down a little bit, and I asked her, I sat down and talked to her, and she said you may not believe this, but when I'm cutting and I'm bleeding, it feels good. It makes the other pains go away.

(R. 750). Judy and Granville had not sought treatment for Suzanne at that time; but when her emotional issues continued, they took her to Dr. Gregory Trainor, a therapist. (R. 751). When Dr. Trainor was not able to control or improve her emotional distress, they sought out other therapists:

> Q. But you didn't quit there. Did you seek other treatment avenues?
>
> A. Oh, yeah.
>
> Q. Who did you see next, if you can recall?
>
> A. There were so many.
>
> Q. How about the lady in Petersburg?
>
> A. Okay, yes, Dr. Kline. She was a psychologist, and a very good one, and I thought - - I had seen her for bereavement grief counseling, and I called and she took her on, and after maybe not even six weeks she told me she couldn't help her, that she needed a psychiatrist, and she knew a very good one in Virginia. And she wrote him a letter at that time, he wasn't take on more new patients, but due to what Dr. Kline had written him about Suzanne and her problems, he took her on.

(R. 752). Judy testified that despite therapy, Suzanne had continued to have problems throughout high school. Id. Judy had received phone calls from Suzanne's high school when she had been skipping school, and on another instance when she tried to commit suicide:

> A. I got a call from the school?
>
> Q. What happened?
>
> A. They said they had taken her to the hospital, that they think she had taken something. At that time they weren't sure what she had taken. I got to the hospital and apparently one of the students told the counselor and the nurse that they thought she was taking uppers, which she had not been, but they had -- so they gave her some major downers, and by the time it all ended up in ICU. She was gone practically.
>
> Q. So that was another incident where she apparently tried to kill herself?
>
> A. Yeah, it was like [we] never had any idea when they were coming.

(R. 753). Suzanne did eventually graduate, nonetheless, and subsequently went to the International Beauty School in Cumberland. (R. 754).

Judy testified that it was also around that time – when Suzanne was nineteen – she had been raped. (R. 765). Judy got a call from the hospital the next morning; Suzanne was "a mess" - upset and crying, with bruises and scratches on her. Id. Judy called the state police immediately to have it investigated. Id. "They took a report, and they were sure to ask her did you say no," but nothing ever came of it. Id.

As to beauty school, Judy stated that Suzanne "got along with the other students okay to an extent," but continued to have issues with teachers:

> Q.    Now, while she was in beauty school did she have another incident?
> A.    Yes. Once again, she felt she was being berated and made fun of involving a teacher again. She called me at home hysterical, and I told her, I said I will come and get you tomorrow and we will go down and talk to the teacher and straighten it all out, okay? Okay, mom, don't forget. I said I won't forget. And before that night was out I got the phone call that they had found her in the bathtub and she was unresponsive. They took her to the hospital and they couldn't seem to bring her back, and they were getting ready to air flight to Conemaugh General to the psych unit, or somewhere out there.

(R. 755-56). When Suzanne recovered, she was eventually able to get her cosmetology license and worked "off and on." (R. 756). Suzanne's parents paid the rent for - and utilities at – the trailer where Suzanne lived. (R. 757). Suzanne got a boyfriend, who Judy eventually realized "had a severe drinking problem." Id. She noted that he seemed like a "really nice guy" at first, but became "very abusive mentally [and] physically." Id. Judy had not known Suzanne to be "into drugs" until she met Michael. Id. Suzanne gave birth to their son in 2006, but she and Michael split up shortly after he was born. (R. 758). Suzanne initially had custody of their son, was "not able to really take care of him," and had "trouble maintaining and keeping him, you know." Id.

> Q.    What kind of problems would you see her actually having?

A. . . . One of the things that used to bug me, she would run out of cigarettes and she didn't have a car. It would be like 2:00, 2:30 in the morning, it could be spring, summer, or winter, it didn't make any difference, and she would take that little boy and walk six blocks to a store and then back home.

Q. So not very good judgment.

A. Not very good judgement [sic] at all.

(R. 759). Although Judy, Granville, and Suzanne's older sister Caroline all "stepped in" to help Suzanne, she still struggled to adequately care for her son. Id. Subsequently, in 2011, Suzanne lost custody of their son, who went to live with his father. (R. 758). There was a period of time where Suzanne "attempt[ed] to control her emotions and get this child back," but "[s]he could never sustain that behavior. She would do so good, and then [she'd be] back off track." (R. 761). Suzanne became pregnant again and gave birth to another son in January 2013; she fared no better caring for that child. Id.

As to Suzanne's symptoms, Judy testified that her moods would change rapidly – "the ups, the downs, or nothing, the blank." (R. 761). Suzanne would have periods where she would get "really depressed" and sleep for long periods of time. Id. There were times when she would not take her medications. (R. 766). However, Judy explained that Suzanne had to take "heavy doses of heavy duty medicine" that would "knock her out;" Suzanne did not like that, and neither did Judy. Id. There were also times when Suzanne would get "extremely depressed and not take [her medication]" or "do anything." (R. 766). There were also times when her moods would swing the opposite direction:

A: She'd get real happy and high, like life is going to be okay, I'm going to be okay, and I'm going to raise my kids, get my own home, get my jobs back, and when within no time it's gone again . . . I don't know where the emotions go, but they'd be done.

Q: And replaced with --

A: Depression.

Q: -- irritability

A: Irritability, this is your fault, it's his fault. It's always somebody's fault.

Q: Would it be fair to say she's had fits of rage?

A:      Oh yes . . . Sometimes she would seem to have this clarify of life and how she'd handle it, or how things had went, and it would be like it doesn't make any difference, mom, I'm a loser, and she'd go around with [her hand in the shape of an] L on her forehead. . . I'm a loser, get over it, get over it, I'm a loser. Of course, by the next day she was ready to take on the world too, but she couldn't handle so much.

(R. 767-768). Judy recalled another illustration of Suzanne's irrational perceptions:

She was so sure that nobody liked her, that she had no friends . . . but when Suzanne passed we kept it very short.  There as a four-hour visiting period, and they always allow you that little bit of time before the people come in, and about 15 minutes before that they came back and asked us if they could go ahead and start letting people in because they were lined down the street, and it was ten degrees below zero outside that night in January. We had close to 400 people come to her wake. All I could stand there and think was you said nobody liked you Suzy. How does all that happen?

(R. 769). Judy testified that dealing with Suzanne and her illnesses made her feel as if they had

"lived an episode of the Jerry Springer show for probably 25 years" – Suzanne would be in

hysterics, and would ask Judy to deal with things – "I can't do it," "can you do it," "can you take

care of it, I can't do it." (R. 760). Judy recalled in particular an incident right after the birth of

Suzanne's youngest son:

A.      She'd had a [Caesarian section], so she had to come home . . . and we hadn't been home a week, and I don't even know where it come from, all of a sudden she goes into hysterics, she's crying, I can't do this, I can't do this on my own, I can't take care of him.
Q.      That's just pretty much how it always --
A.      Yeah.
Q.      Not every day, not every minute?
A.      No.
Q.      But a lot of the times was spent like that?
A.      Yes, sir.
Q.      And she was -- did she tend to be very irritable?
A.      Yes, sir.

(R. 764). Suzanne would ask Judy for help, and then get "aggravated" with Judy when she

helped her. (R. 760). When she got aggravated, she would leave and end up at "various places" –

Judy did not even know where she went, explaining that "[Suzanne] was homeless." Id.  Judy

further testified that even at times when Suzanne was not using drugs, her behavior was not any better – it was "about the same," and she "couldn't tell one way or the other." (R. 763).

**D.      Vocational Evidence**

Also testifying at the hearing was James Ganoe, a vocational expert ("VE"). The ALJ first noted that the only prior work of Suzanne's that qualified as substantial gainful activity ("SGA") was her job as a laborer/factory worker. (R. 771).  Mr. Ganoe characterized Suzanne's past work "laborer, as an assembler of small parts," unskilled, with a specific vocational preparation ("SVP") of 2. Id. "The exertional level in the [Dictionary of Occupational Titles] DOT is light, but as I saw in the record, Your Honor, she described it as she performed it at the medium exertional level." Id. With regards to Suzanne's ability to return to her prior work and perform other work, the VE gave the following responses to the ALJ's hypothetical:

> Q:      In the first hypothetical I'd ask that you assume an individual of the deceased, Ms. Davis' age, education and work experience. She had a high school – she was a high school graduate, no history of special education, had some additional training after high school, was certainly a literate person. She was a younger individual for Social Security purposes with the work history of that assembly job that you classified.
> In the first hypothetical, limited to simple, routine, repetitive tasks with simple work-related decisions, low stress job defined as involving only occasional independent decision-making, minimal changes in the workplace setting. I'll define minimal as less than even occasional. No fast-paced production work, no interaction with the public, and only occasional interaction with coworkers. Now, would a person with those limitations be able to perform the assembler job that she had done?
> A:      I don't believe they would be able to, Your Honor. I think the hypothetical includes no fast-paced work. Certainly assembly line work is fast-paced work.

(R. 771-772). Incorporating the above hypothetical, the ALJ then questioned the VE regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels.

> Q:      Are there jobs that exist in the economy that could accommodate the limitations in that hypothetical?
> A:      Under the medium exertional level, Your Honor, a cleaner. The DOT code is 381.687-018. The SVP is 2, and it's an unskilled position, 190,000 nationally, 1,400 regionally. Also a kitchen helper. This is under the medium exertional level,

Your Honor. A kitchen helper. The DOT code is 318.687-010. The SVP is 2. It's an unskilled position, 950,000 nationally, 6,200 regionally.

Under the light exertional level, Your Honor, a garment sorter. The DOT code is 222.687-014. The SVP is 2. It's an unskilled position, 178,000 nationally, 1,500 regionally. Those are a sampling, Your Honor.

Q: Sir, do you have an additional example of a light job, if there are any, that could also accommodate those limitations?

A: Under the light exertional level, Your Honor, a laundry worker. The DOT code is 369.687-018. The SVP [is] 2. It's an unskilled position. 88,000 nationally, 1,300 regionally.

Q: And sir, for the medium jobs, do you have an additional example that would not require the employee to be involved in food preparation?

A: Under the medium exertional level, Your Honor, a warehouse laborer. The DOT code is 922.687-058. The SVP is 2. It's an unskilled position. 1.7 million nationally, 3,900 regionally.

(R. 772-773). Finally, the ALJ questioned the VE about Plaintiff's ability to work if she was completely credible as to the severity of her condition:

Q: Sir, the next hypothetical, the only change is that in additional to occasional coworkers, no public, the social functioning limitations would be more restrictive, and the occasional would also include supervisors as well. Would that have any impact on the jobs you identified?

A: No, it would not, Your Honor.

Q: Now, sir, the work that you identified today, is all of that full-time competitive employment requiring eight hours a day, five days a week, or an equivalent work schedule?

A: Yes, it is, Your Honor.

Q: Now, within the framework of that full-time workday, what breaks is an employee permitted where they're allowed to be away from the work station?

A: Most employers will give a 15-minute break during the morning, a half an hour to an hour break at lunch, and a 15-minute break during the afternoon. Some employers also give an additional five-minute break during the morning and afternoon for a restroom break.

Q: On an ongoing basis any tolerance for an employee needing additional or unscheduled rest breaks?

A: No, Your Honor.

Q: Any tolerance for the employee being off task while they're supposed to be at their work station doing their job?

A: Most employers will allow an individual to be off task ten percent of the time.

Q: And, sir, what is the absenteeism tolerance for these jobs in these types of jobs?

A: Most employers will allow one to two days per month absenteeism. Anything more than that then the individual would lose the employment.

Q: Now, sir, on an ongoing basis, maybe not every day, but let's say at least weekly,

if an employee was going to exceed any of these tolerances that you've identified in your testimony, are they going to be able to sustain full-time competitive work without getting fired?

A:     No, Your Honor, they would not be able to.

(R. 773-775). Plaintiff's counsel had no additional questions for the VE. (R. 775).

## E.    Other Evidence

Plaintiff's counsel also submitted a sworn affidavit from April Graham, a friend of Suzanne's "since childhood." (R. 1028). Ms. Graham explained that she had known Suzanne for quite some time, as they had gone to school together and remained friends. Id. As a result, Ms. Graham was "well aware of [Suzanne's] problems with mental illness." Id. She related that, during "one of what I would call her periods of extremely poor judgment, [Suzanne conceived and] had a child out of wedlock." Id. Because the father was "not at all reliable" and "not known for very good conduct," Suzanne was "forced to attempt to raise the child without help of the father." Id. Ms. Graham went on to explain:

> 6. [T]hat of course, due to her ongoing illnesses and her bouts of depression, Suzanne was unable to care for the second child by herself; that she had previously had a child but that child had ultimately been placed with [the] father due to her inability to care for that child; that Suzanne did not want anybody to know the actual severity of her condition, because she didn't want to lose custody of the second child, but she could not always take care of the child, so she received help rearing her second child from both her mother and me; that we tried to help her the best we knew how:
>
> 7. [T]hat one of the primary problems which arose in taking care of this second child was the fact that Suzanne, herself, required so much attention and help in her daily life that her family could not always care for both her and the child or, Suzanne would become upset with her family and isolate herself from family, such that I was her remaining source of support, so the child spent a good deal of time with me at my house.

Id. When Suzanne was depressed, Ms. Graham noticed that she would "sleep excessively, be irritable, and unable to reliably meet [her] child's needs." (R. 1029). When manic, Suzanne would be "somewhat argumentative and hard to deal with," "was often in conflict with her parents," would engage in risky behaviors, and struggled to set goals and control her activities and emotions. Id. Ms. Graham explained that Suzanne would often be "unable to remember to

32

[her] medication" or "argue that she did not need [it]." Id. She would "fixate" on one subject for a short period of time, then switch to another; she could not sustain concentration on any one subject for very long. Id. Suzanne "could not tolerate changes to her personal schedule or environment" even if [] necessary for her children. Id.

In Ms. Graham's opinion, "Suzanne was well aware of her illness and struggled to keep it under control, but she seemed [] unable to do so." (R. 1029). "Unless she was closely monitored – no matter what her intentions were – she would lose control and mess up." Id. "She would come into conflict with her family and would attempt to live on her own, only to end up more or less, homeless." Id. Accordingly, Ms. Graham had been helping care for Suzanne's youngest child for the past couple of years; sometimes "for up to 4-5 days at a time." Id. When she did, though, they both "understood that, at any time, she could take the child back or take the child to her parents' home, and she often would." Id. Around Christmas of 2014, Ms. Graham "noticed that Suzanne was, as she often was, somewhat depressed and distressed." Id. Suzanne dropped off her child with Ms. Graham, assuring her she would be back to pick him up; however, after New Year's day passed with no word from Suzanne, Ms. Graham became worried. Id. Subsequently, Suzanne was found deceased in her apartment from an overdose of drugs. Id.

Ms. Graham's observations were that even when Suzanne had "stayed relatively drug free," she had still "suffered mightily from her episodes of depression and mania." (R. 1030). "In the last two years of [Suzanne's] life, she struggled to maintain a place to live and to properly take care of [herself, including personal hygiene;" she often "appeared to just not care." Id. Suzanne's parents "assisted her on a daily basis, both physically and financial[ly; but,] unfortunately, she was so undependable and unable to keep schedules, [withdrawing] for days at a time, that she was difficult to deal with." Id.

**F.      Disability Reports**

In an undated disability report form that she filled out herself, Suzanne listed bi-polar disorder and chronic hepatitis type C as conditions limiting her ability to work. (R. 211). She stopped working on April 30, 2010 when she was fired for not cooperating with management. (R. 212). The highest grade of school she completed was one year of college in 2005. (R. 213). She also had a cosmetology certificate and license following completion of a 2-year program at International Beauty School in 1998. Id. Her prior jobs included cashier, factory laborer, hair cutter, short order cook, and waitress. Id. A Work History Report dated December 26, 2010 reiterated the same (R. 219).

On July 5, 2011, SSA interviewer M. Warnick called Plaintiff to conduct a teleclaim interview pursuant to her case. (R. 234). The Disability Report – Field Office Form (SSA 3367) is brief, but contains a section for "Observations/Perceptions" that the interviewers complete based on their interactions with claimants. Interviewer Warnick recorded that Suzanne had difficulty understanding and concentrating, and that her mother had to answer "most of the questions." Id.

In a Disability Report (Appeal) form dated August 10, 2011, Plaintiff reported her conditions had been "getting progressively worse" around January 2011. (R. 238). She listed memory problems, difficulty remembering appointments, and depression. Id. She was seeing Daniel Miller for drug addiction and treatment; Mountain State Psychological for counseling and therapy, and Dr. Thomas for medication pursuant to treatment of bipolar disorder and anxiety. (R. 239). She elaborated:

> I almost need a care taker to remind me to do the daily care. There are times I can remember to take a shower, I walk around like a zombie, can't remember anything, ie, doctor appointments, showering, eating. I [sic] family take my child a lot because I can not take care of him.

(R. 241). She reported no changes to activities of daily living. Id. On a second disability report, Plaintiff added "loss [sic] thoughts, hard time focusing, memory is bad, organization poor, memory loss" (R. 250).

## G.    Lifestyle Evidence

On an adult function report dated July 4, 2011, Plaintiff reported as to daily activities that she gets her son ready for school; then goes "back to [her] bed and stay[s] there until it's time to get him off the bus [in the afternoon]." She reported caring for her son and pets, though her mom and sister help her. Before her conditions, she was able to "go out in public alone, work with people, and sleep [right]." She reported having trouble falling asleep and staying asleep. "Sometimes [she didn't] sleep for days and ha[d] wrecked [her] car from falling asleep at [the] wheel [due to] not sleeping." She reported forgetting to take her medicine and needing daily reminders. At that time, she was able to prepare her own meals, clean, and do laundry and yard work, spending four hours every other day on those tasks. However, she needed help from others - needed to be told what to do, and sometimes how to do it. She went outside "as little as possible, maybe once a week." She reported being unable to go out alone because she "panic[ked] in public, and sometimes los[t her] temper with people." She could not drive because her license was suspended. She shopped for groceries once or twice a month, for maybe an hour each trip. She could not use a checkbook because she frequently overdrew it; her mother handled her bills because she would forget to pay them. She also spent money impulsively and was not good at managing her money. (R. 227-230).

As to hobbies and interests, Suzanne listed sewing and painting ceramic. She reported doing them about "1 or 2 times a week," but also reported that she did those more frequently in the past; now, it was "hard for [her] to finish anything." She did not spend time with others, and needed reminders to go to her medical appointments – weekly visits with her therapist, and to her

doctor's a few times a month. She denied problems getting along with family, friends, or neighbors. She no longer did any social activities because she could not be around people without going into a panic attack. Her conditions affected her memory, concentration, understanding, and her ability to complete tasks, concentrate, understand, follow instructions, and get along with others.[7] She denied problems with walking or needing to rest after walking. She had difficulty following written instructions, and had to reread them over; as well as difficulty with spoken instructions, she forgets what was said and had to ask people to repeat themselves. She also expressed difficulty getting her "hands and mind to react the way they should." (R. 231-232).

She reported getting along with authority figures "fair." (R. 233). She was fired from two jobs, at Regis and Chat-N-Chew, because "both places said [she] didn't work well with other employees and the patrons. Id. She handled changes in routine "poorly." Id. She had noticed panicking when people get too close to her. Id.

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

---

[7] "I can't remember things, I start things and never finish, I can't concentrate, I don't understand and get confused when I try to follow instructions. I don't get along with many people, it stresses me out." (R. 232).

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.     ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.

2.     The claimant did not engage in substantial gainful activity since September 15, 2008, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: bipolar disorder; anxiety disorder; personality disorder; polysubstance abuse disorder (20 CFR 404.1520(c) and 416.920(c)):

4. The claimant did not have an impairment or combination of impairments that met or medically equalled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She was able to perform simple, routine, repetitive tasks with simple work related decisions. She could perform a low-stress job, involving only occasional independent decision-making and minimal changes in the workplace setting (minimal defined as less than even occasional). She could not do fast-paced production work. She could have no interaction with the public and occasional interaction with coworkers and supervisors.

6. The claimant was unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 4, 1978 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant had at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, from September 15, 2008, through January 2, 2015, the date of her death (20 CFR 404.1520(g) and 416.920(g)).

(R. 715-732).

## VI.    DISCUSSION

### A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).

"[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.     Contention of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is not supported by substantial evidence," (Pl.'s Mot. at 1), and is based on "an error of law." (ECF No. 10).  Specifically, Plaintiff alleges that the ALJ erred in:

1.     Improperly relying on the opinion of a consultative, non-doctor examiner, inconsistent with the directives of 20 C.F.R. § 404.1527;

2.     Improperly discounting and giving little weight to the opinions of Suzanne Davis' treating physician and a second examining psychologist based on the ALJ's selective citation of medical evidence, disregarding court directives; and

3.      Supporting his decision with selective evidence of record that he misinterprets or mischaracterizes, while ignoring other relevant evidence.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br."), ECF No. 10). Plaintiff asks the Court to "remand the claim for the purpose of calculating benefits," as "a remand for any other reason would serve no purpose," or in the alternative, for reconsideration. (Id. at 14-15).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that the ALJ's determinations with respect to each of the Plaintiff's claims were supported by substantial evidence of record, and that the ALJ complied with the directives of this Court in so doing. (Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.")  ECF No. 14). Further, Defendant contends that the ALJ's credibility determination and assessment of the medical opinions were "appropriate." Id.

## C. Analysis of the Administrative Law Judge's Decision

The undersigned finds that the ALJ erred in improperly basing his decision on his own lay interpretation of the medical evidence in this case. This error was additionally significant in that that it contributed to the ALJ's discrediting essentially every expert or witness that was favorable to Suzanne – including the specialist who treated her for nearly seven years including nearly forty appointments; a consulting Ph.D. who had familiarity and experience with Social Security disability matters, Suzanne herself, and the two people who interacted with Suzanne the most – her mother Judy Davis, and her friend and son's frequent caretaker, April Graham. It also caused the ALJ to improperly credit a consultative examiner who saw Suzanne only twice (in 2009 and 2011), whose opinion was based on less evidence than Drs. Thomas and Goudy

considered, and whose methodology was disputed by Dr. Goudy – an issue the ALJ did not address.[8]

### 1. ALJ's Findings

#### a. Credibility of Non-Medical Sources

The ALJ found that Suzanne's, her mother Judy Davis', and April Graham's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision. (R. 722). Specifically, the ALJ found that Suzanne's "treatment records do not support her allegations regarding the severity of her limitations," and her "significant daily activities . . . were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. (R. 729). As to her mother, the "statements made by Ms. Judy Davis . . . [were] given partial weight to the extent they are consistent with the credible evidence of record." (R. 731). The ALJ did not elaborate further as to which statements of Judy's he found consistent with which credible evidence of record. Id. The ALJ did not explain the weight given to Ms. Graham's statements at all, nor did he explain how he reached his credibility decision as to her affidavit.

#### b. Weight Given to Medical Opinions/Evidence

The ALJ gave "statements by Ms. Cosner-Shepherd" great weight, because they were "consistent with her own examination notes as well as with the other credible evidence of record, including mental status examinations by Dr. Thomas." (R. 730).

---

[8] "The record contains two separate psychological evaluations conducted by Tracy Cosner-Shepherd, MS. The first evaluation was conducted in January 2009. In that evaluation it was noted that Ms. Davis had a mild deficiency in concentration based on her ability to do serial threes. However, Ms. Davis graduated from high school with no history of special education services and serial threes would not be appropriate in assessing· concentration for such an individual. It was also found that Ms. Davis had a marked deficiency in recent memory. . . . The second evaluation was conducted in April 2011. In that evaluation a moderate deficiency in recent memory was noted. Also, a mild deficiency was noted in concentration. However, it is not clear what task was used to assess that domain, as page 4 indicates the serial sevens task was used, while page 5 indicates the serial threes task was utilized in that regard." (R. 703).

Agency reviewers Lilly and Marinelli were given little weight because they found no severe mental impairments, and "[the evidence] clearly supports findings that the claimant has severe mental impairments." (R. 730).

"The statement by the psychologist in January 2011" was given significant weight as "this finding of only mild to moderate deficiency in social functioning, concentration, and task persistence, with normal pace, is consistent with the other objective findings in the record." (R. 730).

Despite being "claimant's treating family physician," Dr. Thomas' "significant limitations . . . relating to the claimant's ability to perform even unskilled work" were given little weight, because they were "not supported by the longitudinal record, including his own treatment notes, which generally showed relatively normal mental status examinations with only poor mood, blunted affect, and poor judgment." (R. 730). The ALJ noted that the other portions of the MSEs showed intact memory, good eye contact, linear and goal-directed thought process, and fair insight. Id.

The ALJ additionally gave "Dr. Thomas' November 2015 statements" little weight, because he opined the claimant had "poor insight and judgment, despite the record showing fair insight and poor to fair judgment." (R. 730). The ALJ noted that Dr. Goudy's opinion was given little weight also "for the same reasons." Id. Specifically, the ALJ found that while Dr. Thomas' and Dr. Goudy's *opinions* were consistent with each other, those opinions were inconsistent with Dr. Thomas' *treatment notes* and Ms. Cosner-Shepherd's examinations. Id. The ALJ again referenced "good eye contact," "no difficulty relating to the examiner," "intact memory," and "only occasional . . . problems with concentration." Id. The ALJ cited findings of Ms. Cosner-Shepherd in 2009 and 2011 of mildly deficient concentration, and "concentration and memory deficits in 2010). Id.

The ALJ assigned partial weight to Suzanne's GAF scores, reasoning that the GAF scores "are considered a snapshot of functioning at the time of the examination and do not reflect any specific function-by-function limitations and are not determinative of overall disability. Regardless, even a GAF score of 45-50 (i.e. indicating severe limitations) does not necessarily preclude work." (R. 730). The ALJ also found that the GAF scores were inconsistent with the "mental status examinations generally showing normal findings except for mood, affect, and judgment." (R. 730-31).

### 2. ALJ's Interpretation of the Evidence

#### a. ALJ's Characterization of MSE as "Normal"

In his decision, the ALJ repeatedly referred to MSEs conducted in particular by Dr. Thomas as "normal," "generally normal," or "otherwise normal" and likewise repeatedly cited "normal" mental status examinations as a basis for discounting Suzanne's treating physician Dr. Thomas and Dr. Goudy, as well as "credible evidence of record" detracting from Suzanne's and Judy Davis' credibility. (R. 722, 723, 724, 725, 726, 727, 728, 729, 730, 731).

Plaintiff argues that Dr. Thomas himself certainly never described these mental status examinations as "normal," and at no point did the ALJ cite support from the record for this assumption or solicit the opinion of a medical expert in so concluding. (ECF No. 10 at 7). As such, Plaintiff asserts the ALJ erred because he "simply does not possess the competency to substitute his views on the severity of the Suzanne's psychiatric problems for that of a trained professional." Id., citing Rebrook v. Astrue, 2008 WL 822104 (N.D.W.Va. 2008) and others.

Following suit with the ALJ, Defendant likewise argues that the "generally normal" mental status examinations were permissibly relied upon by the ALJ and provided substantial evidentiary support for his findings. (ECF No. 14-1 at 10). In so doing, Defendant repeats the ALJ's error.

43

An ALJ may not "dispense with [expert opinions] in favor of his own experience." Forquer v. Colvin, 2016 WL 4250364, No. 1:15-CV-57 (N.D. W.Va., August 11, 2016). Nor may an ALJ "cross[] the line between considering the evidence of record and 'playing doctor' by drawing his own medical conclusions about [a Suzanne's] mental impairments." Id. at *7. See also Rebrook v. Astrue, 2008 WL 822104 (N.D.W.Va. 2008) (remanding when "ALJ impermissibly substituted his own judgment for that of a physician by concluding, without any support in the medical record, what CT scans and EEGs showed). There is good reason for this prohibition: ALJs are not medical doctors, and the risk of misunderstanding or misinterpretation is all too real. See, e.g., Louk v. Colvin, 2016 WL 7383814, No. 2:16-CV-9 (N.D.W.Va., Nov. 30, 2016) adopted without objection in 2016 WL 7378941 (ALJ impermissibly discarded opinion of treating specialist and supporting medical opinions in favor of her own wholly inaccurate interpretation of the objective medical evidence); see also Stump v. Colvin, 2016 WL 7077084, Case No. 2:15-CV-76 (N.D.W.Va. Nov. 16, 2016) ("the ALJ briefly mentioned that the results of the echocardiogram were "normal" as supporting Plaintiff's lack of credibility," when ALJ had misunderstood the echocardiogram showing no cardiac sources of emboli - ordered to rule out *possible causes* - as evidence that Plaintiff did not have *strokes* – a wholly inaccurate interpretation).

Relevant here, the ALJ frequently cites fair insight, good eye contact, linear thought process, and proper orientation as evidence that the mental status examinations were "normal." Absent is any explanation as to *how* those particular findings constitute an essentially or otherwise "normal" mental status examination that is inconsistent with the medical opinions and Suzanne's subjective complaints. Because the ALJ failed to provide any explanation for the relevance of his (selective) citation of these few findings, it is impossible to determine if there was any logical rationale, and none is facially apparent. That is, while each component of a

mental status examination has some relevance generally, not all components are equally relevant to *all* conditions. Rather, "[t]he individual case facts determine the specific areas of mental status that need to be emphasized during the examination." DI 34132.011(D)(4).

Take insight, for example. Insight refers to the extent to which a person recognizes that they *have* a mental illness; impaired insight is characteristic of conditions such as dementia or schizophrenia, in which the person may be oblivious.[9] In particular, it is noted that insight and judgment are expressly mentioned in listing 12.02, neurocognitive disorders, the corresponding category for dementia, which Suzanne did not have. On the other hand, insight and judgment are *not* mentioned in 12.04(3), Depressive, bipolar, and related disorders,[10] which Suzanne *did* have. Further, the record is replete with Suzanne's complaints of how her mental conditions in particular affected her. Although she struggled to control her erratic behavior, she nonetheless appeared to be cognizant of whence it came. It is thus unclear what relevance the fact that Suzanne's insight was often assessed as fair has to the issues here. Accordingly, the ALJ's reasoning in citing these few items of assessment of unclear relevance is not supported by substantial evidence.

Indeed, an "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that

---

[9] See the APA Work Group on Psychiatric Evaluation's *APA Practice Guidelines for the Psychiatric Evaluation of Adults*, Third Edition (2016). Online at http://psychiatryonline.org/doi/pdf/10.1176/appi.books.9780890426760.

[10] *Depressive, bipolar and related disorders (12.04).*
   a. These disorders are characterized by an irritable, depressed, elevated, or expansive mood, or by a loss of interest or pleasure in all or almost all activities, causing a clinically significant decline in functioning. Symptoms and signs may include, but are not limited to, feelings of hopelessness or guilt, suicidal ideation, a clinically significant change in body weight or appetite, sleep disturbances, an increase or decrease in energy, psychomotor abnormalities, disturbed concentration, pressured speech, grandiosity, reduced impulse control, sadness, euphoria, and social withdrawal.
   b. Examples of disorders that we evaluate in this category include bipolar disorders (I or II), cyclothymic disorder, major depressive disorder, persistent depressive disorder (dysthymia), and bipolar or depressive disorder due to another medical condition.

points to a disability finding." <u>Lewis v. Berryhill</u>, 858 F.3d 858, *869 (4th Cir. 2017) (citation omitted). Here, in addition to the few components of unclear relevance above, Suzanne's mental status examinations also regularly evidenced 1) poor judgment, 2) blunted affect, 3) low GAF scores, 4) prognoses ranging from poor to guarded to fair, and 5) frequently stressed, depressed, and anxious moods.

The ALJ also selectively cited some instances where Suzanne reported feeling better. Of the over forty mental status examinations in this record, Suzanne's moods were positively expressed – i.e., "pretty good," – on six out of forty-three occasions. Suzanne's moods were neutrally expressed – i.e., "okay" or "all right" – on six out of forty-three occasions. On thirty-one out of forty-three mental status examinations, Suzanne's mood was negatively expressed, ranging from "miserable" or "a mess," to "depressed and anxious" or "sad," to "I'm here, and that's about all." <u>See</u> <u>Appendix A</u> (Mental Status Examinations Table).

Accordingly, the fact that Suzanne's mood was expressed in positive terms around fourteen percent (14%) of the time is not substantial evidence supporting the ALJ's conclusion. Rather, it is logically inconsistent in two ways. First, her moods were negatively expressed around seventy-two percent (72%) of the time; second, a key symptom of Suzanne's bipolar disorder was mood *swings*, in which her moods vacillated from low to high.

> Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks.
>
> There are four basic types of bipolar disorder; all of them involve clear changes in mood, energy, and activity levels. These moods range from periods of extremely "up," elated, and energized behavior (known as manic episodes) to very sad, "down," or hopeless

periods (known as depressive episodes). Less severe manic periods are known as hypomanic episodes.[11]

Accordingly, the fact that Suzanne sometimes was feeling "up" rather than "down" is thus, in absence of any explanation, a facially illogical basis for finding Suzanne or her doctors less credible. If anything, evidence of mood swings bolsters their credibility.

"We do not reflexively rubber-stamp an ALJ's findings," Lewis, 658 F.3d at *870, nor do we "credit even those findings contradicted by undisputed evidence." Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006). The undersigned cannot find the ALJ's decision to be supported by substantial evidence when it is not sufficiently explained to determine the rationale between the evidence cited and his conclusions, with no logical connection apparent, because the "meaningful review" with which the court is tasked is not possible. Radford v. Colvin, 734 F.3d 288 at *296 (4th Cir. 2013). The same is true when the ALJ has selectively cited evidence that is (allegedly) unfavorable to Suzanne and ignored other evidence favorable to her. Lewis, 858 F.3d. Both have occurred here.

### 3. ALJ's Treatment of Medical Opinions

20 CFR § 404.1527 outlines how SSA evaluates medical opinions. 20 CFR § 404.1527(e)(2)(i) provides in relevant part that, although ALJs "must consider findings and other opinions of . . . program [] psychologists," ALJs are not bound by them. Rather, such findings are evaluated "using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other

---

[11] "Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks." National Institute of Mental Health, *Bipolar Disorder: Definition*. Available online at https://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml.

factors relevant to the weighing of the opinions." § 404.1527(e)(2)(ii). The factors include (1) examining relationship, (2) treatment relationship, (i) length of relationship and frequency of examination, (ii) nature and extent of treatment relationship, § 404.1527(c)(2), (3) supportability, (4) consistency, (5) specialization, and (6) other factors such as understanding of disability programs and familiarity with the record. § 404.1527(3)-(6).

### a. Ms. Cosner-Shepherd

The ALJ credited two medical opinions. The basis the ALJ articulated for giving Ms. Cosner-Shepherd's "statements" great weight was that "they are consistent with her own examination notes as well as the other credible evidence of record, including mental status examinations by Dr. Thomas." (R. 730). In explaining his finding, the only "other credible evidence of record" the ALJ cites is Dr. Thomas' mental status examinations. (R. 730).

"It is not the role of the courts to search for reasons for a decision that were not furnished by the ALJ." Reynolds v. Berryhill, No. 1:16-CV-29, 2017 WL 1128602 (N.D.W.Va. March 24, 2017) (quoting Jackson v. Colvin).  Accordingly, at issue here is simply whether Dr. Thomas' mental status examinations provide substantial evidentiary support for Ms. Cosner-Shepherd's statements. The undersigned generally cannot find that any determination the ALJ made citing the MSEs is supported by substantial evidence, given its flawed foundation – including this one. Specifically, apart from the ALJ's misinterpretation of those mental status examinations, no alternative basis is clear.

The only basis the ALJ articulated for giving "the Psychologist in January 2011" significant weight, was that it was "consistent with the other objective findings in the record." (R. 730). Because both of these assignments of weight were based in large part on the ALJ's improper and unsupported characterization of Suzanne's mental status examinations as "normal"

also renders the ALJ's determination as to Ms. Cosner-Shepherd unsupported by substantial evidence.

The ALJ also determined that Suzanne's Global Assessment Function ("GAF") scores, which averaged in the 50s, merited only "partial weight," for two reasons. First, the ALJ gave less weight to the GAF scores because they were inconsistent with the "mental status examinations generally showing normal findings except for mood, affect, and judgment." (R. 730-31). As discussed above, this is an insufficient and improper basis given the ALJ's impermissible lay interpretation. given the mental status examinations generally showing normal findings, except for mood, affect, and judgment. This is illustrated by the ALJ's rationale: "Of note, the undersigned points to records indicating the same GAF score of 50 despite having no complaints and "doing well" at one visit (Ex. 6F/5) and feeling very depressed and anxious with her mood described as "a mess" at the next visit (Ex. 6F/9). This suggests that perhaps there were periods of time she was functioning at a higher level than was indicated by the subjective GAF score." (R. 731).

A review of the MSEs, see Appendix A, shows that although Dr. Thomas most often found Suzanne's GAF score to be 50, there were times when it was higher or lower. In particular, at her appointments spanning from October 15, 2007, to November 4, 2008, Suzanne's overall ratings were some of her best in that period of time. During that period of time, Suzanne's affect, which was usually blunted, was appropriate; her judgment, which was normally poor, was fair; her subjective descriptions of mood were positive on at least three of those occasions – accounting for half of her positive mood ratings. Accordingly, during that time period, with the exception of one GAF score of 50 on January 15, 2008, the GAF scores during that time were rated at 55 and once at 60 – the highest GAF scores Suzanne evidenced over her entire treatment with Dr. Thomas. Viewed in their totality, there is no apparent inconsistency. This is inconsistent

with the ALJ's lay interpretation of a single instance where Suzanne had a GAF score of 50 while stating she was "doing well." (R. 731) ("Of note, the undersigned points to records indicating the same GAF score of 50 despite having no complaints and "doing well" at one visit (Ex. 6F /5) and feeling very depressed and anxious with her mood described as "a mess" at the next visit (Ex. 6F /9)"). The ALJ concluded that his lay interpretation of selective GAF scores "suggests that perhaps there were periods of time she was functioning at a higher level than was indicated by the subjective GAF score." (R. 731). Considered as a whole, the GAF scores are not inconsistent and so the ALJ's basis[12] for discounting them is invalid. This evidence, and what it may fairly mean, is the province of the medical experts – not the ALJ. Further, this violates Lewis' (858 F.3d at *869) prohibition against "selectively cherrypick[ing]" evidence to support the ALJ's conclusion, as well as Dunn v. Colvin's prohibition against dredging up "specious inconsistencies." 607 Fed.Appx. 264, 267 (4th Cir. 2015).

Second, the ALJ found the GAF scores "are considered a snapshot of functioning at the time of the examination and do not reflect any specific function-by-function limitations and are not determinative of overall disability. Regardless, even a GAF score of 45-50 (i.e. indicating severe limitations) does not necessarily preclude work." (R. 730). This, too, is insufficient. First, as Plaintiff points out, the "snapshot" rationale is logically devoid when there are forty-three snapshots spanning seven years. Second, whether a GAF score "precludes work" is not the issue. While not determinative of a disability finding, the GAF scores are evidence that is nonetheless relevant to the credibility and weight determinations made by the ALJ. Because the

---

[12] While the Commissioner argues that GAF scores are no longer in the DSM-V, that argument was never articulated by the ALJ as the basis of *his* reason for assigning partial weight to those scores, so the Commissioner's *post hoc* rationale is of unclear relevance. The Commissioner cites Finley v. Colvin, 2013 WL 6384355, Case No. 3:12-7908 (S.D.W.Va. Dec. 5, 2013), where that observation was made; however, it consisted of a single sentence in a footnote and was not dispositive. Notably, the Commissioner does not content that the Social Security Administration has decided to prohibit consideration of GAF scores as relevant to weight or credibility. For both reasons, the relevance remains unclear.

ALJ likewise substituted his own lay interpretation of the GAF scores in finding them –

apparently - inconsistent, this rationale too fails.

### b. Dr. Thomas

### i. Treating Physician Rule

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs

treating source medical opinions:

> *How we weigh medical opinions*.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship*.  Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the **medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations**. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
> >
> > > (i) *Length of the treatment relationship and the frequency of examination*.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more

weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other

> information in your case record are relevant factors that we will
> consider in deciding the weight to give to a medical opinion.

(emphasis added). Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded great weight because they "reflect[] an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig v. Chater, however, the Fourth Circuit further elaborated on this rule:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not absolute." See Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

Some issues are reserved specifically for the Commissioner and opinions on such issues "are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, a

medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

An ALJ's assignment of weight "generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' [] has failed to give a sufficient reason for the weight afforded a particular opinion," or has not reached a rational conclusion. Dunn v. Colvin, 607 Fed. App'x 264, 266-67 (4th Cir. 2015) (internal citations omitted). Here, the ALJ clearly failed to give a sufficient reason for affording Dr. Thomas' little weight was based on all of the above, the undersigned additionally would note that Dr. Thomas' opinion is a far cry from the types of situations in which a treating physician's representations have merited less than controlling weight in this circuit.

A treating physician's assessment may warrant less than controlling weight when his treatment was infrequent, and his opinion was unsupported by his own treatment notes or other information in the file. Russell v. Comm'r of Soc. Sec., 440 Fed.Appx. 163 (4th Cir. 2011) (Rheumatologist had not seen claimant for six months when he wrote his opinion, and he opined that claimant's limited use of her hands precluded work, despite having noted at her prior visit that she had full range of motion in her hands). A treating physician also loses credibility when her testimony is directly contradicted by her own treatment notes. Burch v Apfel, 9 Fed. App'x. 255 (4th Cir. 2001) (Treating physician given little credibility when she testified that 1) Claimant was admitted to the hospital for suicidal thoughts, when her notes clearly indicated Claimant's condition was stable and she was not considered harmful to herself or others; 2) Claimant's poor response to medication was not her fault, when treatment notes clearly indicated otherwise – "as usual she had not given the medication adequate time to reach some degree of remission;" 3) Claimant's alcohol consumption did not contribute to her failure to recover, when notes indicated

Claimant continued to drink against physician's advice and that it was "not beneficial;" and numerous other contradictions and inconsistencies discussed at length by the ALJ).

Dr. Thomas treated Suzanne Davis for over seven years. He saw her on at least thirty-seven occasions over the course of those seven years. His treatment was regular and ongoing for a long period of time. His opinion was not contradicted by his treatment notes as illustrated above, in that Dr. Thomas, as a result of his longitudinal treatment of Suzanne, noted that she was 1) not malingering, and 2) was at times not taking her medications due to factors outside her control (i.e., the medications being stolen, or her conditions causing difficulty maintaining constant compliance). The ALJ's own improper lay opinion of Dr. Thomas' MSEs is, as discussed, an impermissible and legally insufficient basis on which to conclude they do not support his opinion. Further, the ALJ's discredit of Dr. Thomas was also based on "specious inconsistencies," see Forquer, and "selective cherrypicking" of evidence. Lewis, 858 F.3d. at *869. Accordingly, the ALJ's reasons failing to afford Dr. Thomas controlling weight are not supported by substantial evidence.

After noting that he gave Dr. Thomas' and Dr. Goudy's opinions little weight, the ALJ then stated that:

> Nonetheless, [he had] considered these opinions in finding the claimant limited to simple, routine, repetitive tasks with only simple work-related decisions, low stress jobs, minimal changes in the workplace setting, no fast-paced production work, no interaction with the public, and occasional interaction with coworkers and the public.

(R. 730). As a preliminary matter, it is obvious that Suzanne could not have "no interaction with the public," while having "occasional interaction with [] the public." Id. Plaintiff additionally argues that the ALJ failed to articulate what "these opinions" refers to specifically, leaving it unclear how exactly he reached that particular RFC. (ECF No. 10 at 11). Further, Plaintiff argues that if the ALJ had in fact credited the opinions of Drs. Thomas and Goudy in reaching the RFC,

Suzanne would have met the listing; therefore, the ALJ cannot have done so. Id. The undersigned agrees. The rationale here does not suffice to assure the undersigned that the errors were not harmless.

### 4. Credibility

The determination of whether a person is disabled by pain or other symptoms is a two-step process. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[13] capable of causing the degree and type of pain alleged. Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id.

Generally, an ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)). Deference to an ALJ's credibility determination, however, is not absolute.

A reviewing court is tasked with determining whether substantial evidence supports a disability determination, and whether the correct law was applied. 42 U.S.C. § 405(g). As such, an ALJ must have met his basic duty of explanation sufficient to permit meaningful judicial review. "[An ALJ's] determination that fails to meet the basic duty of explanation can – and should – be reversed." Poling v. Berryhill, 2017 AL 2676541 (N.D.W.Va. Jun. 6, 2017). An

---

[13] Step one is fulfilled here. The ALJ in his decision stated that Suzanne's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (R. 722). Thus, the Court addresses only Step Two.

ALJ's credibility determination must further conform with the directives in the Commissioner's Regulations, which are binding upon the Commissioner. 20 C.F.R. § 402.35(b)(1). Accordingly, a credibility determination that does not conform to at least these minimum requirements cannot be affirmed.

Further, even if those basic requirements are met, a credibility determination may be flawed in other ways. An ALJ may not cross "the line between considering the evidence of record and 'playing doctor' by drawing his own medical conclusions about [a Suzanne's] . . . impairments." Forquer v. Commissioner, No. 1:15CV57, 19 (N.D. W.Va. 2015), citing Frank v. Barnhart, 326 F.3d 618, 621-22 (5th Cir. 2003) (noting that ALJ impermissibly made his own independent medical assessments by drawing his own medical conclusions from the medical evidence of record).

Social Security Ruling 96–7p, which sets out factors used to assess the credibility of an individual's subjective symptoms, was superseded by SSR 16-3p effective March 28, 2016.[14] In so doing, the Commissioner explained:

> **PURPOSE:**
> We are rescinding SSR 96-7p: Policy Interpretation Ruling Titles II and XVI Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements and replacing it with this Ruling. We solicited a study and recommendations from the Administrative Conference of the United States (ACUS) on the topic of symptom evaluation. Based on ACUS's recommendations and our adjudicative experience, we are eliminating the use of the term "credibility" from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation. Consistent with our regulations, we instruct our adjudicators to consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms. We evaluate the intensity

---

[14] Federal Register Vol. 81, No. 51, page 14166, subsequently corrected by Federal Register Vol. 81, No. 57, page 15776; also published on SSA website, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2016-03-di01.html.

and persistence of an individual's symptoms so we can determine how symptoms limit ability to perform work-related activities for an adult.

<u>Id.</u>  In addition to medical evidence and a Suzanne's statements, the factors remain:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p.

### a. Suzanne's Credibility

The ALJ found Suzanne's subjective allegations "not fully credible" because, "in evaluating the claimant's testimony," "despite her complaints, there is insufficient medical evidence to establish disability." (R. 731). This was based on the ALJ's flawed lay interpretation of the medical evidence. Further, it is an incorrect statement – and application - of the law.

A plaintiff's subjective statements about the intensity, persistence, or pace of her symptoms need not be corroborated by objective medical evidence to be accepted. <u>Hines v. Barnhart</u>, 453 F.3d 559, 565 (4th Cir. 2006) ("Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test." (footnote omitted)). Indeed, 20 CFR 416.929 directs the ALJ to take a claimant's

subjective statements into account *unless* they *cannot* reasonably be accepted as consistent with the objective medical and other evidence.[15]

As to what other evidence ALJ Rippel considered, he states that Suzanne's "treatment records do not support her allegations regarding the severity of her limitations," apparently in large part based on "generally normal" mental status examinations, which the ALJ particularly emphasized. (R. 729). As discussed at length above, the ALJ's lay characterization of Suzanne's mental status examinations as "generally normal" or "otherwise normal" was improper. Nor does the ALJ have the expertise to make that determination when no medical professional has done so. See e.g. Forquer. Accordingly, her treatment records do not contradict the severity of her limitations, as explained by the ALJ, and do not support the ALJ's decision on this issue.

The ALJ also indicated that Suzanne had "significant daily activities, including caring for her son, doing chores, cooking, cleaning, doing laundry, grocery shopping, driving, painting ceramics, sewing, and doing puzzles." (R. 729). This is highly questionable. Suzanne was hardly capable of "caring for her son," as evidenced by the fact that she lost custody of her oldest son. As to her youngest son, her family members and April Graham routinely had to "take him," because Suzanne could not sustain caring for him on a continued basis. Further, characterization of these activities of daily living – even setting aside the fact that they are overplayed here – as "significant" is likewise questionable.

---

[15] (3) Consideration of other evidence. **Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms.** The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. **Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account** as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. (emphasis added).

A claimant's daily activities are relevant evidence when assessing his alleged symptoms. 20 C.F.R. § 404.1529. However, "[w]e have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job *outside* the home." Louk v. Colvin, No. 2:16-CV-9, 2016 WL 7383814 at *22 (N.D. W.Va. Nov. 30, 2016) (citing Craft v. Astrue, 539 F.3d 668, (7th Cir. 2008) (emphasis added)). Indeed, in contrast, the types of daily activities that negate credibility include significantly more demanding activities than the ones described by Suzanne here. See Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001) (riding a bike, walking in the woods, and traveling to distant states without significant difficulty undermined claimant's subjective complaints of pain and fatigue); Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011) (driving, caring for horses and dogs, riding horses and operating a tractor was conflicting evidence) (remanded on other grounds for new evidence); Kearse v. Massanari, 73 Fed.Appx. 601 (4th Cir. 2003) (cutting wood, mowing grass, and occasionally shopping contradicted a disability determination). Suzanne's daily activities here thus hardly rise to a level that would negate her credibility under our precedent.

The ALJ further states that the "medical records reveal that medications have been relatively effective in controlling the claimant's symptoms, and many of her symptoms appear to increase when off medication." (R. 729). This is inaccurate. This record is replete with instances where Dr. Thomas was near constantly adjusting Suzanne's medications because any "feeling better" Suzanne occasionally reported never lasted for long. The record contains numerous instances when Suzanne's symptoms increased, regardless of whether she was on her medication or off of it at the time. Suzanne made references to the unpleasant side effects of those medications. Lastly, although the ALJ avoided improperly discussing Plaintiff's compliance with medication on remand, the position above disregards the fact that her illnesses contributed to the difficulty she had trying to stay current on her medication, as Dr. Thomas noted.

### b. Insufficient explanation for Judy Davis being found "partially credible."

The ALJ began by stating that "the claimant's Judy Davis', and Ms. Graham's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 722).

After reciting record evidence for ten pages, the ALJ then stated "the statements by Ms. Judy Davis have been considered and are given partial weight to the extent they are consistent with the credible evidence of record." (R. 731). This sentence does not suffice to permit meaningful review as to what precisely is consistent – or inconsistent – with Judy Davis' testimony that negates her credibility. This is especially so given that the ALJ's interpretation of the "evidence of record" was impermissibly flawed, as noted above.

### c. No explanation for Amber Graham being found "partially credible."

As to Ms. Graham, the ALJ did not mention her again, not even to offer a vague sentence as to why he found her to be less than credible.

### VII.    CONCLUSION

For all of these reasons, the undersigned finds that ALJ Rippel's – and thus the Commissioner's – decision is based on errors of law and is not supported by substantial evidence. Accordingly, it is recommended that this case be remanded. Although recommended on the abovementioned bases, however, there are two additional matters that should also be addressed.

### 1.  Consideration of PTSD

At the second hearing pursuant to remand, Plaintiff's attorney stated to the ALJ:

> The other thing that troubles me about this case, Your Honor, and I know you'll consider it, but this girl had PTSD, and the Cosner-Shepherd girl identified it twice, April House mentioned it, Tony Gouty did the testing and found it, and the federal district court turned around and said you're not supposed to consider that. I know that they missed an impairment in the first go round. In the first hearing Social Security missed an entire

impairment, PTSD. And when you mix all that stuff together, and you see her irritability, and her flying off the handle rage, all these things are well couched or contained within either a bipolar system and/or PTSD, which I think she had both.

(R. 777). In the prior case, Suzanne argued that the ALJ had failed to consider a severe

impairment – PTSD:

> Ms. Davis' records show she suffers from PTSD that significantly limits Ms. Davis' mental abilities to perform work. Tr. 708. At the hearing, Ms. Davis' identified PTSD as a problem and Dr. Goudy found PTSD as a diagnosable problem. Tr. 67, 708.

Case No. 5:14-CV-83, ECF No. 10 at 5. The Commissioner responded:

> Plaintiff attacks the ALJ for failing to address her post-traumatic stress disorder (PTSD), ignoring the fact that there was no PTSD diagnosis until after the ALJ issued his decision. Even without a specific diagnosis, however, the ALJ explicitly considered the effects of Suzanne's PTSD when analyzing her anxiety, and accounted for limitations resulting from these symptoms when formulating Suzanne's RFC. Put simply, an explicit reference to bipolar disorder or PTSD by the ALJ would not alter the outcome in this case.

Case No. 5:14-CV-83, ECF No. 11. The Magistrate Judge's report and recommendation stated:

> **2. PTSD**
> As noted above, Suzanne also asserts that the ALJ erred at Step Two by not considering PTSD as a severe impairment. Suzanne states: "The bottom line is that the record contains a PTSD diagnosis by Dr. Goudy and an affirmation of that diagnosis by Dr. Thomas .... The ALJ' s decision did not address PTSD .... The Appeals Council did not reconcile this evidence." (Suzanne's Reply at 3.)
> **Plaintiff did not allege disability due to PTSD**, and so the ALJ never considered whether PTSD should be included as one of her severe impairments. The evidence submitted by Suzanne to the Appeals Council does not establish that Suzanne was disabled by PTSD for the time period prior to the ALJ's decision. See <u>Mitchell v. Schweiker</u>, 699 F.2d 185, 188 (4th Cir. 1983). Given this, the undersigned finds that the information in Dr. Goudy' s report relating to Suzanne's PTSD is not material to the issue before the ALJ. If anything, it could be used to buttress a new disability claim filed by Suzanne asserting disability since January 2013.
> To remand for consideration of the evidence regarding Suzanne's PTSD diagnosis is tantamount to allowing Suzanne to prosecute a different and later disability claim based on the original disability claim filing date. In other words, allowing remand would frustrate the appeal process. The appeal process's purpose is to determine whether the ALJ applied the correct law and did not abuse his or her discretion during the fact-finding process. See <u>Szubak v. Sec'y of Health & Human Servs.</u>, 745 F.2d 831, 833 (3d Cir. 1984). The line is therefore drawn at the ALJ's decision. Accordingly, the undersigned finds no error in the Appeals Council's decision to not remand Suzanne's case to the AU for consideration of her PTSD diagnosis.

Case No. 5:14-CV-83, ECF No. 14 at 34-35. Upon review, the District Judge's order stated:

> It should be noted, however, that a portion of Dr. Goudy's report discusses the Suzanne's PTSD diagnosis. This Court agrees with the magistrate judge's recommendation concerning that portion, meaning that such portion of Dr. Goudy's report should not be considered when this civil action is remanded. **The Suzanne did not initially allege PTSD as a disability, and thus that portion of Dr. Goudy's report may not be considered on remand**.

(R. 824). It is unclear that this was proper, for the reasons articulated below.

### a. Suzanne alleged disability due to PTSD a year prior to her hearing.

While it is true that Suzanne did not include PTSD specifically in her first application, dated December 9 (DIB) and 20 (SSI), 2010 (R. 176), Suzanne *did* allege disability due to PTSD prior to her hearing with ALJ Nagle, on more than one occasion. In her Request For Hearing by Administrative Law Judge, dated October 24, 2011, nearly a *year* prior to the hearing, Suzanne clearly stated "**I am disabled due to** chro[n]ic d[e]pression, chronic Hep C, **PTSD** and social anxiety." (R. 128.). In Suzanne's Pre-Hearing Memorandum, dated August 17, 2012, three days prior to the hearing, Suzanne again reiterated to ALJ Nagle that she:

> **[wa]s disabled as a result of** a combination of psychological problems which have plagued her for many years. Presently, the Claimant suffers from the following serious conditions/ impairments:
> - *Bi-polar Disorder;*
> - ***Post Traumatic Stress Disorder;***
> - *Anxiety Disorder;*
> - *Kidney Failure; and*
> - *Hepatitis C*

(R. 270, italics in original, emphasis added). At the hearing before ALJ Nagle, Suzanne specifically stated that she is prevented from working, in part, by "post-traumatic stress syndrome," which "tends to hit [her] sometimes when the most stressed." (R. 967). Accordingly, the undersigned cannot agree that Suzanne had not timely alleged disability due to PTSD.

### b. The ALJ never considered whether PTSD should be included as one of her severe impairments.

63

At minimum, it is certain that ALJ Nagle must have been aware of Suzanne's PTSD allegations. In addition to Suzanne's express allegations of disability due to PTSD in at least two documents submitted prior to the hearing before ALJ Nagle, the ALJ noted in her opinion that she considered Suzanne's Function Report (R. 790), which explicitly contained reference to PTSD. At the hearing before the ALJ, Suzanne specifically discussed her PTSD. (R. 967). In Ms. Cosner-Shepherd's evaluation, which ALJ Nagle gave great weight (R. 795), she opined that Suzanne quite possibly had PTSD and should be evaluated for same (R. 599) ("one should confirm a diagnosis of posttraumatic stress disorder, which does seem appropriate"). ALJ Nagle specifically kept the record open for 14 days after the hearing "to allow the submission of additional medical records." (R. 784).

As such, the idea that ALJ Nagle purposely did not consider PTSD because it had not been alleged is directly contradicted by evidence in the record, which confirms that Suzanne *did* allege it, and that the ALJ waited two weeks after the hearing for the consideration of additional medical evidence. However, because ALJ Nagle made no reference to PTSD whatsoever in her decision, it is impossible to know whether she had 1) considered it and determined it to be nonsevere, but failed to so state; 2) determined it should not be considered for some unexplained reason; or 3) failed to consider it at all. The undersigned thus cannot find support in the record for the assertion that the ALJ never considered PTSD, or that – if she had not – that it was for a particular reason beyond mistake, inattention, or neglect.

    c.  **"The evidence submitted by Suzanne to the Appeals Council does not establish that Suzanne was disabled by PTSD for the time period prior to the ALJ's decision. See <u>Mitchell v. Schweiker</u>, 699 F.2d 185, 188 (4th Cir. 1983)."**

The evidence submitted to the Appeals Council, in combination with the evidence already before ALJ Nagle, need not establish that Suzanne was disabled by PTSD. Rather, the ALJ was required to consider Suzanne's impairments "singly and in combination." A failure to

consider it singly constitutes a failure to consider it in combination, as the ALJ was obligated to do if it had been determined to be severe – which, of course, such determination was never undertaken. Thus, whether PTSD alone "disabled" Suzanne prior to the date of the ALJ's decision is not the issue.

> ### d. "The line is drawn at the ALJ's decision."

It is well settled that a plaintiff may provide additional evidence to the Appeals Council, after the ALJ's decision – without even needing to show good cause. <u>Wilkins v Sec'y,</u> 953 F.2d 93 (4th Cir. 1991). Accordingly, the line is not "drawn at the ALJ's decision." However, even if it was, as explained above, Suzanne here alleged PTSD as a disabling condition as early as a *year* prior to the hearing before the ALJ, reiterated same in her pre-hearing memorandum to the ALJ three days prior to the hearing, and explicitly discussed PTSD at the hearing with the ALJ. Even if the line was drawn at the ALJ's decision, there is ample evidence in the record of Suzanne's provision well before that point.

Although an "official" diagnosis of PTSD was not made by Dr. Goudy until 2013, that fact, in and of itself, does not preclude consideration of the PTSD Suzanne obviously suffered from prior to the day of her "official" diagnosis. This record contains the evaluation of agency examiner Tracy Cosner-Shepherd, who the ALJ afforded great weight, in which she explicitly indicated Suzanne should be evaluated for PTSD – on two separate occasions in 2009 and 2011 - due to the significant possibility she had that condition based on her symptoms. The fact that no doctor in the interim saw fit to make an express, explicit diagnosis between 2009 and 2013 does not suffice to negate the clear connection and the distinct likelihood that it related back.

Nonetheless, it is not clear that this has any significant bearing, since PTSD symptoms were apparently – and properly are – considered in formulation of her RFC, and in making

determinations of weight and credibility. In any event, Plaintiff did raise the issue with the ALJ, but has not raised the issue to the court, and it is likely *res judicata* at this point.

## 2. Purpose of Remand

Plaintiff asks that this case be remanded "for the purpose of benefits," as a "remand for any other reason would serve no purpose." (ECF No. 13 at 5). Although remand for award is appropriately rare, the circumstances here would appear to make this one of those rare cases. This situation is similar to that in Rebrook v. Astrue, 2010 WL 2233672, No. 1:09-CV-50 (N.D.W.Va. May 14, 2010). In Rebrook, the magistrate judge observed:

> Under this Fourth Circuit precedent reversal without remand for rehearing or additional evidence is therefore appropriate where: 1) the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard; and 2) reopening the record for more evidence would serve no purpose. The undersigned finds that the ALJ's decision was not supported by substantial evidence. The ALJ twice failed to properly consider the opinions of claimant's treating physicians; twice failed to consider the third party witnesses; twice failed to properly evaluate Plaintiff's credibility; and most importantly, found she had no severe seizure impairment despite every piece of evidence, including the first decision and Court Order indicating she had. The undersigned therefore finds substantial evidence on the record as a whole indicates that the Claimant was disabled. Further, reopening the record would serve no purpose in this case—there are no inconsistencies and further development is not required regarding Plaintiff's claim.

Id. at *32; see also Breeden v. Weinberger, 493 F.2d 1002 (4th Cir. 1974) ("Ordinarily we would remand to give the Secretary an opportunity to apply the correct legal standard. This case, however, has been pending in the agency and the court for almost five years and has been remanded once before for additional evidence.").

Here, Suzanne is deceased; she passed away in January of 2015. As a result, there cannot and would not be any new medical evidence upon reconsideration; reopening the record would thus truly serve no purpose. Further, a remand for any purpose other than award would serve only to further delay a claim that has been pending since 2010 – nearly seven years. This report and recommendation marks the third time a judge in this district has determined that the ALJs'

attempts to discredit Suzanne's treating physician Dr. Thomas, the supporting opinion of Dr. Goudy, and the statements of Suzanne on various bases were improper.[16] The undersigned sees no point in providing the Commissioner a fourth opportunity to do the same.

## VIII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is not supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 9 be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **DENIED**, and the decision of the Commissioner be vacated and this case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for award of benefits.

Any party may, within fourteen (14) days after being served with a copy of the original Report and Recommendation,[17] file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Amended Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for

---

[16] In prior case No. 5:14-CV-83, Magistrate Judge Kaull's Report and Recommendation (ECF No. 14) and Senior Judge Stamp's order adopting the Report and Recommendation (ECF No. 15), and the instant Report and Recommendation.
[17] As this Amended Report and Recommendation contains no substantive changes from the original, and corrects only formatting issues (as noted on page 1), any objections remain due on the original schedule.

Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this August 8, 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE